# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **FELLOWSHIP FILTERING TECHNOLOGIES, LLC,** | |
| *Plaintiff,* | Civil Action No._____ |
| **v.** | **JURY TRIAL DEMANDED** |
| **ALIBABA.COM, INC.; ALIBABA SINGAPORE E-COMMERCE PRIVATE LTD.; ALIBABA GROUP HOLDING LTD.; ALIBABA.COM HONG KONG LTD.; ALIBABA.COM LTD.; ALIBABA.COM INVESTMENT HOLDING LTD.; ALIBABA.COM INVESTMENT LTD.; ALIBABA (CHINA) TECHNOLOGY CO., LTD.; TAOBAO HOLDING LTD.; TAOBAO CHINA HOLDING LTD.; AND TAOBAO (CHINA) SOFTWARE CO.** | |
| *Defendants*. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Fellowship Filtering Technologies, LLC ("Fellowship Filtering" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent No. 5,884,282 ("the '282 patent"). Defendants Alibaba.com, Inc., Alibaba Singapore E-commerce Private Ltd., Alibaba Group Holding Ltd., Alibaba.com Hong Kong Ltd., Alibaba.com Ltd.,Alibaba.com Investment Holding Ltd., Alibaba.com Investment Ltd., Alibaba (China) Technology Co., Ltd., Taobao Holding Ltd., Taobao China Holding Ltd., and Taobao (China) Software Co., Ltd. (collectively, "Alibaba" or "Defendant") infringes Fellowship Filtering's '282 patent in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*.

## INTRODUCTION

1.      In an effort to expand its product base and profit from the sale of infringing computer-based data analytics technologies, Alibaba has undertaken to copy the technologies and

inventions of Gary Robinson, the inventor or the '282 patent and a co-owner of Fellowship Filtering.

2.    Alibaba runs an online global marketplace through its websites Alibaba.com, AliExpress.com, and Taobao.com (collectively, the "Alibaba Websites") that implement infringing technologies to facilitate the sale of products.  Alibaba positions its data analytics systems as providing customers and suppliers with revolutionary mechanisms for gaining insights into customer behavior that facilitate the sale of products.  Alibaba's data analytics systems incorporate the inventions disclosed in Mr. Robinson's '282 patent.  "[W]e offer you personalized recommendations based on your browsing and search history, e.g. newly displayed products and other buyers' preferred products relating to your search terms."[1]  European and U.S. Patents assigned to Alibaba have cited Mr. Robinson's work as relevant prior art.[2]

3.    Quan Yuan, Technical Director of TaoBao Recommendation has described Alibaba's use of predictive algorithms as integral to the success of Alibaba's products.  The below slide from a 2014 presentation by Mr. Yuan shows how Alibaba provides recommendations using collaborative filtering techniques developed by Mr. Robinson.

---

[1] *Alibaba Product Recommendations*, ALIBABA WEBSITE (last visited December 1, 2015), available at: http://www.alibaba.com/recommended-products.html; *see also Alibaba Group Holding Limited Form 20-F*, ALIBABA GROUP SECURITIES AND EXCHANGE FILING at 89 (June 2015) ("Alibaba Group's mobile products can help grow revenue with location-based services and targeted product recommendations to individual consumers.").

[2] *See* U.S. Patent No. 8,234,291, WO Patent App. 200846338, and EP Patent App. 2075720 (all assigned to Alibaba Group Holding Limited and citing Mr. Robinson's paper regarding effective filtering entitled "*A Statistical Approach to the Spam Problem*" as prior art.).



Qiang Yan and Quan Yuan (Tao Search and P13N Team), LARGE SCALE RECOMMENDATION IN E-COMMERCE (October 10, 2014), *available at*: http://www.slideshare.net/scmyyan/large-scale-recommendation-in-ecommerce-qiang-yan.

4.    Patents and patent applications assigned to Alibaba Group Holding Limited have described the use of Mr. Robinson's inventions as improving the functioning of computer systems and enabling the delivery of relevant computer based recommendations.

> If similar, the exemplary embodiments determine that the similarity score between the attribute value of the nominal attribute of the first product and the attribute value of the nominal attribute of the second product is relatively high. Otherwise, the similarity score is relatively low. As a result, the exemplary embodiments can determine a similarity score based on the semantic meaning that is implicitly included in attribute values and thereby ***improve the accuracy of computing a similarity score between values of a nominal attribute***.

U.S. Patent App. 13/381,822, *Method and Apparatus of Determining A Linked List Of Candidate Products* (filed October 18, 2011; published August 1, 2013) (emphasis added) (This patent application is assigned to Alibaba Group Holding Limited and cites as prior art two patents (of six) that reference the patent-in-suit as relevant prior art.).

> It is apparent that an effective ***recommended result is crucial since*** an aimless recommendation causes low acceptance of the ***recommended result and a waste of computing resource***.

U.S. Patent App. 14/028,279, *Recommending Product Information* (filed September 16, 2013; published March 20, 2014) (emphasis added) (patent application assigned to Alibaba Group Holding Limited).

5. Mr. Robinson is a mathematician and inventor of computer-based recommendation engine technologies that enable the recommending of products and/or content based on novel algorithms that calculate the preferences based on the similarity and dissimilarity of users of a website.

6. Mr. Robinson studied mathematics at Bard College and New York University's Courant Institute of Mathematical Sciences. Mr. Robinson is the recipient of the National Science Foundation – SBIR award.

7. Mr. Robinson is a named inventor of numerous United States Patents. Mr. Robinson's patents have been acquired by companies including Google, Inc. ("Google").[3] Patents referencing Mr. Robinson's '282 patent have been purchased or assigned to companies including: International Business Machines Corporation ("IBM"),[4] Google,[5] Amazon.com, Inc. ("Amazon"),[6] and Intel Corporation ("Intel").[7]

## ROBINSON'S LANDMARK ELECTRONIC MAIL INVENTIONS

8. The Robinson Method, named after Gary Robinson, is a Bayesian statistical approach that uses a text-classifier, rule-based method for determining the relevancy of an email message. Numerous leading SPAM filtering technologies utilize the Robinson Method.[8]

---

[3] *See* USPTO Assignment Abstract of Title Database Reel/Frame No. 021552/0256.

[4] U.S. Patent Nos. 6,356,879; 6,931,397; 7,006,990; 7,080,064; 7,099,859; 7,389,285; 7,885,962; 8,700,448; and 8,825,681.

[5] U.S. Patent Nos. 7,966,632; 8,290,964; and 8,762,394.

[6] U.S. Patent Nos. 6,266,649; 7,113,917; 7,433,832; 7,478,054; 7,664,669; 7,778,890; 7,908,183; 7,921,042; 7,945,475; 8,001,003; 8,024,222; 8,108,255; 8,140391; and 8,180,689.

[7] U.S. Patent Nos. 6,405,034, 7,590,415, and 7,797,343.

[8] Ricardo Villamarín-Salomón & José Carlos Brustoloni, *Bayesian Bot Detection Based on DNS Traffic Similarity,* in SAC'09: ACM SYMPOSIUM ON APPLIED COMPUTING 2040—41 (2009); Masahiro Uemura & Toshihiro Tabata, *Design and Evaluation of a Bayesian-filter-based Image Spam Filtering Method,* in PROCEEDINGS OF THE 2008 INTERNATIONAL CONFERENCE ON INFORMATION SECURITY AND ASSURANCE 46-51 (2008) ("the Robinson Method"); MARCO ANTONIO BARRENO, Technical Report No. UCB/EECS-2008-63, EVALUATING THE SECURITY OF MACHINE LEARNING ALGORITHMS 45 (2008); Manabu Iwanaga et al., *Evaluation of Anti-Spam Methods Combining Bayesian Filtering and Strong Challenge and Response,* in PROCEEDINGS OF CNIS'03 (COMMUNICATION, NETWORK, AND INFORMATION SECURITY) 214—19 (2003); BLAINE NELSON, Technical Report No. UCB-EECS-2010-140, BEHAVIOR OF MACHINE LEARNING ALGORITHMS IN ADVERSARIAL ENVIRONMENTS 62-67 (2010); Gordon V. Cormack & Mona

9.      Mr. Robinson's contributions to the field of electronic mail filtering are recognized as landmark technologies.[9]

> Robinson Fisher Method: With the Robinson Fisher method, Gary Robinson developed a more sophisticated way to ensure sensitivity for both recommendations and rejections. Consequently, the Robinson Fisher approach replaced the Geometric Means proposal. To formulate two null hypotheses one must assume ideal conditions, i.e. that token frequencies are pairwise independent, not uniformly distributed, and that the description consists of a random set of tokens. We then calculate a score

Günther Hölbling, PERSONALIZED MEANS OF INTERACTING WITH MULTIMEDIA CONTENT 119 (2011).

10.      Mr. Robinson has published academic articles on statistical approaches to identifying content.  A 2003 article in Linux Journal described these mathematical approaches for identifying unsolicited bulk email.  Mr. Robinson's approach was notable because it assigned scores to both "spam" and "ham" and used an algorithm to guess intelligently whether an incoming email was spam.  This approach was incorporated in products such as SpamAssassin, which used a Bayesian statistical approach using a text-classifier rule to distinguish "spam" and "ham" messages.[10]

11.      Mr. Robinson's inventions relating to filtering technologies have been widely adopted by spam filters including Spam Assassin[11] (PC Magazine's Editor's Choice for spam

---

Mojdeh, *Autonomous Personal Filtering Improves Global Spam Filter Performance*, in PROCEEDINGS OF THE 6TH CONFERENCE ON EMAIL AND ANTI-SPAM 2 (2009).

[9] *See also* U.S. Patent No. 8,234,291, WO Patent App. 200846338, and EP Patent App. 2075720 (all assigned to Alibaba Group Holding Limited.

[10] Gary Robinson, *A Statistical Approach to the Spam Problem*, LINUX JOURNAL 107 (2003).

[11] *SpamAssassin Pro*, in PC MAGAZINE February 25, 2003 at 82 (awarding SpamAssassin Pro its editors' choice award); *The SpamAssassin Project: Train SpamAssassin's Bayesian Classifier,* http://spamassassin.apache.org/full/3.2.x/doc/sa-learn.html ("Gary Robinson's f(x) and combining algorithms, as used in SpamAssassin"); *Credits - The Perl Programming Language - Algorithms*, http://cpansearch.perl.org/src/JMASON/Mail-SpamAssassin-3.2.5/CREDITS ("The Bayesian-style text classifier used by SpamAssassin's BAYES rules is based on an approach outlined by Gary Robinson. Thanks, Gary!").

filtering), SpamSieve[12] (MacWorld's Software of the Year), and SpamBayes[13] (PC Worlds Editor's Choice for spam filtering).

## ROBINSON'S DEVELOPMENT OF CONTENT FILTERING SYSTEMS

12.    Prior to developing groundbreaking electronic mail filtering technologies, Mr. Robinson used his insights to develop the automated content filtering technologies that are used today by Alibaba and many of the world's largest corporations without attribution or compensation.

13.    In the late 1980's, Mr. Robinson developed a system for collecting preference information and providing recommendations.  His company, 212-ROMANCE, was an automated, voice-based dating service that used a passive data collection process to determine likely romantic matches.[14]  Mr. Robinson's contributions to the field of content filtering were pioneering.



Few people in the technology industry can say they once ran a successful dating service. Even fewer can say that the dating service led to the creation of a technology used by everyone from the digital music industry to the largest corporations in the world.

But Gary Robinson, chief executive of Bangor-based Transpose LLC, can say that.

Matthew French, *Romantic Beginnings Have Worldwide Effect*, BOSTON BUS. J., May 20, 2002.

---

[12] David Progue, *From the Deck of David Progue: The Follow-Up Edition*, N.Y. TIMES, April 5, 2006, http://www.nytimes.com/2006/04/05/technology/06POGUE-EMAIL.html ("Spam Sieve is just incredibly, amazingly accurate; my in box is clean, baby, clean!").

[13] Tom Spring, *Spam Slayer: 2003 Spam Awards*, PCWORLD MAGAZINE, December 15, 2003, at 36 ("What makes the program unique is that SpamBayes doesn't use predetermined spam definitions.  Rather, it constantly evolves by scanning your in-box to build custom definitions."); MARCO ANTONIO BARRENO, Technical Report No. UCB/EECS-2008-63, EVALUATING THE SECURITY OF MACHINE LEARNING ALGORITHMS 45 (2008) ("SpamBayes classifies using token scores based on a simple model of spam status proposes by Robinson . . . . SpamBayes Tokenizes the header and body of each email before constructing token spam scores.  Robinson's method assumes that each token's presence of absence in an email affects that email's spam status independently from other tokens.").

[14] 212-Romance was incorporated under the name Microvox Systems, Inc.

6

14.     In the mid-1990s, Mr. Robinson recognized that the growing adoption of the internet and increased computational power enabled collection and processing of data relating to customer and user preferences that, with proper data analytics processes, could provide accurate recommendations of products and content.

15.     Mr. Robinson further recognized that the growth of the internet led to unique problems involving information overload that filtering techniques using specific new collaborative filtering technologies could solve.

16.     At the time, existing recommendation technologies, discussed in the '282 patent, failed to teach a robust and accurate process for providing recommendations.  A key insight of Mr. Robinson was that the input of buying habits and/or ratings information from multiple users over the internet allowed similarity values among users to be calculated based on identifying subgroups of similar users.

17.     Mr. Robinson invented an automated collaborative filtering ("ACF") system that received and stored data based on internet users' purchasing history, preferences, and/or buying history.  When a new user accessed the ACF system through a website (in one embodiment), the ACF system recommended further content (*e.g.*, products) based on the similarity values for the first user as compared with other users that previously provided preference data to the ACF system.

18.     Mr. Robinson worked to develop novel systems and processes designed to provide accurate content and product recommendations using data stored, collected, and computed on specific computer-based systems.  Mr. Robinson's insights led to the patent application resulting in the '282 patent.

19.     The patent-in-suit - the '282 patent - is a pioneering patent in the field of data analytics.  The '282 patent uses novel algorithmic approaches to provide accurate recommendations of products and content using data analysis specific to a computer system.

> good. The creative license for statistical filtering really belongs to hackers like Paul Graham, Gary Robinson, and Bill Yerazunis and the rest of the community that has invented many of these approaches. Some companies have claimed the technology as their own, which gives people the idea that any other solutions are nonstandard, when it's really borrowed technology.

Jonathan A. Zdziarski, ENDING SPAM: BAYESIAN CONTENT FILTERING AND THE ART OF STATISTICAL LANGUAGE CLASSIFICATION 269 (2005).

      20.    The '282 patent has been cited by over 443 United States patents and patent applications as prior art before the United States Patent and Trademark Office.[15]  Companies whose patents cite the '282 patent include:

- OpenText S.A.
- Accenture Global Services GMBH
- YellowPages.com LLC
- Nielsen Holdings N.V.
- International Business Machines Corporation
- Koninklijke Philips N.V.
- Google, Inc.
- Amazon.com, Inc.
- Microsoft Technology Licensing LLC
- Arbor Networks, Inc.
- Johnson & Johnson Consumer Companies
- S.C. Johnson & Son Inc.
- Sony Electronics, Inc.
- Infosys Ltd.
- Parasoft Corporation
- AT&T Intellectual Property LLP
- Dish Network LLC
- eBay, Inc.
- Rovi Corporation
- CBS Interactive, Inc.
- American Express Company
- Hewlett-Packard Company
- Xerox Corp.
- Capital One Financial Corporation
- JDA Software Group, Inc.
- State University of New York
- Robert Bosch Healthcare System, Inc.
- Netflix, Inc.

---

[15] The 443 forward citations to the '282 patent do not include patent applications that were abandoned prior to publication in the face of the '282 patent.

- Intel Corporation
- Tribune Media Company
- Ingenio, LLC
- Recommend, Inc.
- Dassault Systemes S.A.
- Pandora Media, Inc.
- Pace plc
- Regents of the University of California
- Facebook, Inc.
- Numera, Inc.

21.    Patents citing Mr. Robinson's '282 patent as prior art have been asserted by

Amazon.com, Inc. ("Amazon") and Netflix, Inc. ("Netflix") in patent infringement cases:

- Amazon asserted U.S. Patent No. 6,266,649, entitled "Collaborative Recommendations Using Item-to-Item Similarity Mappings," against Discovery Communications, Inc. ("Discovery").  The '649 patent claimed a priority date of September 1998 (subsequent to the '282 patent).  Amazon's '649 patent cited Mr. Robinson's '282 patent as prior art during prosecution before the Patent and Trademark Office.  After two years of litigation, Discovery took a license to Amazon's '649 patent (prior to claim construction being adjudicated).[16]
- Netflix asserted U.S. Patent No. 7,024,381, claiming a priority date of April 2000, against Blockbuster LLC ("Blockbuster").  The '381 patent referenced the '282 patent as prior art. A settlement and license agreement was reached between Netflix and Blockbuster on the verge of trial.[17]
- Robert Bosch Healthcare Systems, Inc. ("Robert Bosch") asserted U.S. Patent Nos. 7,223,235 & 7,223,236 against MedApps, Inc ("MedApps").  The '235 and '236 patents cite Mr. Robinson's '282 patent as prior art.  MedApps reached a settlement and license with Robert Bosch roughly one year after the infringement action was initiated.[18]
- Black Hills Media LLC ("Black Hills") asserted U.S. Patent Nos. 8,028,323, 8,230,099, and 8,458,356.  The '323, '099, and '356 patents referenced Mr. Robinson's '282 patent as prior art.  Black Hills settled a majority of its cases following denial of summary judgment of invalidity.[19]
- i2 Technologies, Inc. ("i2") asserted U.S. Patent No. 7,370,009 against Oracle in the Eastern District of Texas.  Subsequently, Oracle asserted four patents against i2's parent,

---

[16] *Amazon.com Inc v. Discovery Communications Inc*., Case No. 09-cv-00681 Dkt. Nos. 122 & 166 (W.D. Wash.).

[17] *Netflix, Inc. v. Blockbuster, Inc*., Case No. 06-cv-02361 Dkt. No. 239 (Cal. N.D.).

[18] *Robert Bosch Healthcare Systems, Inc. -v- MedApps, Inc*. Case No. 12-cv-00113 Dkt. No. 64 (Cal. N.D.); US. Patent No. 8,028,323 Information Disclosure Statement (March 3, 2010).

[19] *Black Hills Media LLC v. Sonos, Inc*., Case No. 14-cv-00486 Dkt. Nos. 129 & 169 (Cal. C.D.).

JDA Software Group.  Following a year of litigation, the parties reached a settlement in March 2011.[20]

22.    Cases against Oracle, Discovery and Blockbuster underscore the inventive nature of the '282 patent, as the above asserted cases involve patents referencing Mr. Robinson's '282 patent as prior art.

23.    The claims in the '282 patent are directed at solving a problem that did not arise in prior art systems, *i.e.* generating preference data from large data sets.  In prior art systems, the sample size of users was typically very small, and thus the need for a process that takes into account unusual similarities was not at issue.  There is no question pre-electronic recommendation systems are significantly different from computer and/or internet-based recommendation systems.  The speed, quantity, and variety of rating information markedly differ from the objectives and data available to recommendation systems existing before modern, computer and/or internet-based systems.  Differences between the analog versions of preference systems and the invention disclosed in the '282 patent diverge significantly.

24.    The use of ratings data and probability values to make recommendations over a computer network was not a longstanding or fundamental economic practice at the time of the invention disclosed in the '282 patent.  Nor at the time was the use of ratings data and probability values to make recommendations a fundamental principle in ubiquitous use on the internet or computers in general.  Dr. Zeynep Tufekci of Harvard University's Berkman Center for Internet and Society described recommendation engine systems such as the systems disclosed in the '282 patent as being far from a "law of nature."

> The fear I have is that every time this is talked about, people talk about it as if it's math or physics, therefore some natural, neutral world.  And they're

---

[20] *i2 Technologies, Inc. et al v. Oracle Corporation et al.*, Case No. 10-cv-00284 Dkt. Nos. 85 & 130 (E.D.Tex.) (i2 asserted several predictive analytics patents against Oracle); Erin Coe, *I2, Oracle Resolve Software Patent Battle*, LAW360, March 4, 2011, http://www.law360.com/articles/229787/i2-oracle-resolve-software-patent-battle.

programs! They're complex programs. **They're not like laws of physics or laws of nature. They're created by us.**[21]

25.    The '282 patent discloses how interactions with the internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by requesting content or a product that is relevant to a user of a website.

26.    Patents assigned to Alibaba have described the use of filtering techniques based on data provided by users – as improving the functionality of a computer network.

> Upon receiving a query entered by a user, a semantic pattern matching the query is determined, and possible search results are filtered and ranked using the corresponding filtering and ranking methods.  Because user intentions based on historical data are accounted for in the analysis and presentation of search results, **the relevance between user intentions and retrieved results are improved, and search accuracy is increased.**

U.S. Patent App. 12/807,217, *Information Retrieval Based On Semantic Patterns Of Queries* (filed August 30, 2010; published March 10, 2011) (emphasis added) (patent assigned to Alibaba Group Holding Limited).

27.    Patents assigned to Alibaba have stated the use of Bayesian posterior probabilities (based on user inputs) reduce the requirements for computer system resources and improve the functioning of computer systems.

> Specifically, the disclosed method and apparatus compute expected values of relevancy between log files and search requests based on Bayesian posterior probabilities, in response to finding expected values of relevancy between a search request submitted by a user and log files that are relevant to the submitted search request from a search data structure, and order the found log files in a descending order of the found expected values.  As such, the relevancy on which the ordering is based is better.  Furthermore, users can use less browsing time and fewer clicks to obtain most desired information quickly, thus **reducing the cost of a search process for a search engine server and saving system resources of the search engine server**.

U.S. Patent No. 8,528,975, *Method and Apparatus of Ordering Search Results* (issued September 17, 2013) (emphasis added) (assigned to Alibaba Group Holding Limited).

---

[21] *What Makes Algorithms Go Awry?*, NATIONAL PUBLIC RADIO, ALL THINGS CONSIDERED, June 5, 2015, http://www.npr.org/sections/alltechconsidered/2015/06/07/412481743 (emphasis added) (the quotation is from an interview with Dr. Tufekci).

28.    Alibaba has claimed in filings with the United States Patent and Trademark Office that recommendation systems such as those disclosed in the '282 patent improve the performance of computer systems by reducing network data transmission and preventing the degrading of performance of computer systems.

> [T]he occurrence of unnecessary recommendations could needlessly consume limited network resources by causing an increase in the volume of data transmitted in the network and reducing network data transmission speeds.

U.S. Patent App. 13/136,420, *Product Recommendation System* (filed August 3, 2010; published February 9, 2012) (this patent application is assigned to Alibaba Group Holding Limited).

29.    The use of probability values in collaborative filtering (as in the '282 patent) to control for generally popular content and/or products is important and offers something more than a collaborative filtering system that fails to control for the general popularity of content and/or products.[22]  Data scientists at Hulu, LLC (operator of a streaming video website) described the importance of accounting for general popularity of a given item:

> Just because a recommendation system can accurately predict user behavior does not mean it produces a show that you want to recommend to an active user.  For example, "Family Guy" is a very popular show on Hulu, and thus most users have watched at least some episodes from this show.  These users do not need us to recommend this show to them — the show is popular enough that users will decide whether or not to watch it by themselves.  Thus, ***novelty is also an important metric to evaluate recommendations***.[23]

---

[22] Executives at Alibaba competitors have stated that predictive analytics functionality such as functionality similar to the inventions disclosed in the '282 patent transform data.

> The database companies will have you believe that "big data" equals databases.  That's just a scam so they can sell you big databases.  It's true that the amount of data is going up.  If you look at the amount of information produced from the beginning of time to 2008, and the amount of information produced between 2008 and now, it's ten times more.  It's mind-boggling.novelty

Wade Roush, *TIBCO's Vivek Ranadivé on the 'Death of Science,' the Rise of Pattern Recognition, and the Power of Data in Basketball*, XCONOMY.COM WEBSITE, August 8, 2011, http://www.xconomy.com/san-francisco/2011/08/10/tibcos-vivek-ranadive-on-the-death-of-science-the-rise-of-pattern-recognition-and-the-power-of-data-in-basketball/.

[23] Liang Xiang, Hua Zheng & Hang Li, *Hulu's Recommendation Engine*, HULU TECH BLOG, Sept. 19, 2011, http://tech.hulu.com/blog/2011/09/19/recommendation-system/ (emphasis added).

30.     Oracle white papers have identified a critical drawback in many recommendation

systems is the failure to account for "popularity bias."

> They tend to over recommend popular items because they are clicked on more
> often. This would be the equivalent of an in-store sales associate only
> recommending items on the end-caps and never looking at merchandise on the
> upper shelves in the aisles—often the items that are most difficult to find.[24]

31.     Ten years after Gary Robinson conceived of the inventions in the '282 patent, a

2005 White Paper from Oracle, entitled "The Art of Personalization," described the use of

collaborative filtering to provide recommendations as "new technology" and a "breakthrough:"

> Collaborative filtering is relatively *new technology that can deliver better
> results*. Just go to the leading Web sites that offer "recommendations" and
> you notice the value. After purchasing a book on *Learning to Golf*, you later
> return to the Web site and find other books on *Greatest Golf Courses* and *Golf
> Tips from the Pros*. These recommendations seem relevant, timely, and yet
> sometimes simplistic. Often you'll see other *Learn to...* books and videos,
> like *Learn to Ski*, *Learn to Play Tennis*, and *Learn to Sew*. Compared to past
> manual attempts at personalization and "e-expectations," this is a
> *breakthrough*.[25]

32.     Alibaba data scientists have recognized the importance of Mr. Robinson's

inventions, including the ability to create systems that account for the popularity of an item.

> That is, two users could be considered similar not only if they rated the web
> pages similarly, but also if they have similar cognitions over these pages.
> This kind of additional semantic information can be used to address the
> sparsity problem further.

Shengchao Ding, Shiwan Zhao, Quan Yuan, Xiatian Zhang, Rongyao Fu, and Lawrence Bergman.
*Boosting Collaborative Filtering Based On Statistical Prediction Error,* in PROCEEDINGS OF THE
2008 ACM CONFERENCE ON RECOMMENDER SYSTEMS (2008).

> 'In the second experiment, a random user is selected and a search performed
> for similar neighbors in a randomly generated subset of the user space instead
> of the whole one, which is termed as' random all but one and focuses on the
> performance of the neighborhood selection. Here, we have randomly
> generated 4 subsets with the total user population being as 500, 2000, 4000,
> and 6000 accordingly. Table 3 shows the experimental results. The *crucial*

---

[24] Next-Generation Product Recommendations, Oracle White Papers 6 (March 2011).

[25] CHARLES BERGER, ORACLE WHITE PAPER: THE ART OF PERSONALIZATION 4 (August 2005)
(emphasis added).

*step in collaborative filtering recommendation systems is the selection of the neighborhood*.

S. Zhao, N. Du, A. Nauerz, X. Zhang, Q. Yuan, and R. Fu, *Improved Recommendation Based On Collaborative Tagging Behaviors*, in PROC. OF INT. CONF. ON INTELLIGENT USER INTERFACES (2008) (emphasis added).

## THE PARTIES

33.    McKinney, Texas based Fellowship Filtering is committed to advancing the current state of technology in the field of predictive analytics systems.  In addition to the ongoing efforts of Mr. Robinson, Fellowship Filtering employs a McKinney, Texas resident as a Technology Analyst.  Fellowship Filtering is a Texas limited liability company with its principal place of business at 6851 Virginia Parkway, Suite 214, McKinney, Texas.



34.    Fellowship Filtering is a small, Texas-based company.  Fellowship Filtering depends on patent protection to effectively license its innovative technologies and build its business.

35.    On information and belief, Alibaba like Fellowship Filtering places significant value on its intellectual property.  Like Fellowship Filtering, "Alibaba was founded on the simple belief that small businesses are the bedrock of a prosperous society.  And that everyone that wants

to do business should have the chance to succeed."[26]  Alibaba and Fellowship Filtering's businesses are based on the protection of intellectual property.



*Alibaba Group Intellectual Property Protection Website*, *IPR Protection and Cooperation* (last visited December 1 2015).[27]

36.    Upon information and belief, Alibaba.com, Inc. is a corporation organized and existing under the laws of Delaware, with a place of business at 400 S. El Camino Real, Suite 400, San Mateo, CA 94402, and a registered agent for service of process at National Registered Agents, Inc., 818 W. Seventh St., Los Angeles, CA 90017.  Upon information and belief, Alibaba.com, Inc. is a subsidiary of Alibaba Ltd. and operates as a "B2B e-commerce company" and also focuses on technology maintenance, marketing, and administrative services.  Upon information and belief, Alibaba sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services that perform infringing processes into the stream of commerce knowing that they would be sold in this judicial district and elsewhere in the United States.

---

[26] Jack MA, ALIBABA GROUP: STANFORD GRADUATE SCHOOL OF BUSINESS ENTREPRENEURIAL COMPANY OF THE YEAR INDUCTION CEREMONY (transcript on file) (September 30, 2015).

[27] *See also* Eileebn Yu, *Alibaba Stocks Up On Patents Before IPO,* ZDNET.COM (April 30, 2014), available at: http://www.zdnet.com/article/alibaba-stocks-up-on-patents-before-us-ipo/ ("The Chinese tech giant also has applied for more than 300 other patents encompassing technology such as payment processing, image search, and product recommendations."); Susan Decker, *Alibaba on Patent-Buying Spree May Avoid Tech IPO Pitfall*, BLOOMBERG NEWS (April 28, 2014), available at: http://www.bloomberg.com/news/articles/2014-04-29/alibaba-on-patent-buying-spree-may-avoid-tech-ipo-pitfall ("Alibaba Group Holding Ltd. is beefing up its patent holdings in the U.S., a move that may help avoid the pitfalls that bedeviled Google Inc., Facebook Inc. and Twitter Inc. ahead of their initial public offerings . . . . Patents can help drive up the proceeds in IPOs for software firms, according to a 2012 study by a researcher at the University of Bordeaux in France.").

37.     Upon information and belief, Alibaba.com Singapore E-commerce Private Ltd. is a company organized and existing under the laws of Singapore, with a registered address at 10 Collyer Quay # 10-01, Ocean Financial Centre, Singapore 049315 and, upon information and belief, can be served at that address by mail, agent, or letters rogatory.  Upon information and belief, Alibaba.com Singapore E-commerce Private Ltd. sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services that perform infringing processes into the stream of commerce knowing that they would be sold in this judicial district and elsewhere in the United States.

38.     Upon information and belief, Alibaba Group Holding Ltd. is a holding company organized and existing under the laws of the Cayman Islands, with a place of business at 26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong and a registered agent for service of process at Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, New York 10036.  Upon information and belief, Alibaba Group Holding Ltd. sells and offers to sell products and services throughout the United States, including in the Eastern District of Texas, and introduces products and services that perform infringing processes into the stream of commerce knowing that they would be sold in this judicial district and elsewhere in the United States.

39.     Alibaba.com Ltd. is organized and exists under the laws of the Cayman Islands, with its principal address at 699 Wang Shang Road, Binjiang District, Hangzhou 310052, PRC.12 Alibaba Ltd. is a wholly-owned subsidiary of Alibaba Group and the indirect holding company of the PRC subsidiaries relating to Alibaba Group's Alibaba.com, 1688.com, and AliExpress businesses.

40.     Alibaba.com Hong Kong Ltd. is organized and exists under the laws of Hong Kong, with its principal place of business at 26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong. Alibaba.com Hong Kong is wholly owned by Alibaba Ltd. Alibaba.com Hong Kong operates the websites www.alibaba.com and www.aliexpress.com.

41.     Alibaba.com Investment Holding Ltd. is organized and exists under the laws of the British Virgin Islands, with an address at Trident Trust Co. (B.V.I.) Ltd., Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands VG1110.  Alibaba Investment Holding is a direct, wholly-owned subsidiary of Alibaba Ltd. and a lower-level holding company of the PRC subsidiaries relating to Alibaba Group's Alibaba.com, 1688.com, and AliExpress businesses.

42.     Alibaba.com Investment Ltd. is organized and exists under the laws of the British Virgin Islands, with an address at Trident Trust Co. (B.V.I.) Ltd., Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands VG1110.  Alibaba Investment is the principal holding company for Alibaba's strategic investments.

43.     Alibaba (China) Technology Co., Ltd. is organized and exists under the laws of, on information and belief, PRC, with an address at 699 Wang Shang Road, Binjiang District, Hangzhou 310052, PRC.  Alibaba Technology is an entity primarily engaged in the operations of Alibaba Group's wholesale marketplaces.

44.     Taobao Holding Ltd. is organized and exists under the laws of the Cayman Islands, with an address at Trident Trust Co. (Cayman) Ltd., One Capital Place, P.O. Box 847, Grand Cayman KY1-1103, Cayman Islands.  Taobao Holding is a wholly-owned subsidiary of Alibaba Group and the indirect holding company of the PRC subsidiaries relating to the Taobao Marketplace and Tmall platforms.

45.     Taobao China Holding Ltd. is organized and exists under the laws of Hong Kong, with an address at 26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong. Taobao China Holding is the direct wholly-owned subsidiary of Taobao Holding Ltd. Taobao China Holding is a direct holding company of the PRC subsidiaries relating to the Taobao Marketplace and Tmall platforms, and is the operating entity for the overseas business of Taobao Marketplace and Tmall.

46.     On information and belief, Taobao (China) Software Co., Ltd. is organized and exists under the laws of, on information and belief, PRC, with its registered address, at Jingfeng

Village, Wuchang Subdistrict, Yuhang District, Hangzhou Zhejiang 310013, PRC.  Taobao Software is engaged in the operations of the Taobao Marketplace.

47.     Alibaba regularly conducts, transacts, or solicits business within the Eastern District of Texas, engages in other persistent courses of conduct, and/or derive substantial revenue from goods and/or services used or consumed within the Eastern District of Texas; Alibaba regularly and systematically directs electronic activity into the State of Texas with the manifest intent of engaging in business within the Eastern District of Texas; Alibaba conducts, transacts, and solicits business in the Eastern District of Texas and derives substantial revenue from goods and/or services used or consumed within the Eastern District of Texas in connection with the unlawful conduct complained of herein; and the unlawful conduct engaged in by Alibaba, complained of herein, caused and continues to cause injury to Fellowship Filtering within this District.

## JURISDICTION AND VENUE

48.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

49.     Upon information and belief, this Court has personal jurisdiction over Alibaba in this action because Alibaba has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Alibaba would not offend traditional notions of fair play and substantial justice. Defendant Alibaba, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the '282 patent.  Moreover, Alibaba derives substantial revenue from cross-border e-commerce, international and interstate commerce, including with the United States, in return for the services they provide to legitimate and illegitimate Internet merchants:

50.     On information and belief Alibaba generated $1 billion in revenue from international commerce in the year ended March 31, 2015.[28]

51.     Alibaba.com, an English-language wholesale marketplace for global trade owned and operated by the Alibaba Defendants, hosts buyers and sellers from the United States.  United States manufacturers and distributors sell their products on Alibaba.com and the United States is one of the three biggest markets for buyers on Alibaba.com.[29]

52.     AliExpress.com, a global consumer marketplace and English-language site owned and operated by the Alibaba Defendants, sells products from wholesalers and manufacturers in China to consumers in the United States.  In the three months ended March 31, 2014, the United States was one of the three biggest markets for buyers on AliExpress.com.[30]

53.     Goods purchased on Alibaba.com and AliExpress.com are regularly shipped into the United States, including into the State of Texas.

54.     Goods purchased from Taobao.com, a Chinese-language website owned and operated by the Alibaba Defendants, are regularly shipped into the United States, including into the State of Texas.

55.     Taobao Marketplace authorizes agents to make purchases on behalf of buyers from the United States and to ship goods into the United States, including into the State of Texas.

56.     Taobao Marketplace advertises an "International Forwarding Service" to ship goods purchased from Taobao.com internationally.  Taobao Marketplace notes that certain goods are prohibited from international shipment, including "reactionary" or "obscene" materials, but notably does not state any prohibition against goods shipped to the forum (Texas).

57.     Alibaba.com and AliExpress.com target customers in the United States through online marketing and advertising—for example and without limitation, through pop-up

---

[28] Alibaba Group Holding Limited Form 6-K, filed with the U.S. Securities and Exchange Commission on May 7, 2015 ("Form 6-K"), at 9.

[29] F-1 at 154, 156.

[30] F-1 at 154.

advertisements targeted to Internet users in the United States, including users within the State of Texas.

58.     Taobao.com displays pop up ads displaying an American flag and an image of the Statue of Liberty, along with a message in Chinese characters which, translated, reads "Dear, you can still shop on Taobao when you are located in the US." There is a link that reads "more information" in Chinese and navigates the browser to a page with more information about shipping and shopping tips, emphasizing how easy it is to shop from the U.S.

59.     On information and belief, millions of web users from the United States (including the State of Texas) visit Alibaba's infringing properties every day.

60.     On information and belief, Alibaba.com receives an estimated 8.1 million unique visitors daily and over 39 million daily page views. Approximately 5% of Alibaba.com's visitors are from the United States. Alibaba.com is the 306th most visited site in the United States, ranking above popular sites such as Foxsports.com, Sprint.com, and Nike.com.[31] Alibaba markets itself including at product fairs such as International CES directed at customers in the Texas.[32]

61.     On information and belief, AliExpress.com receives an estimated 9.9 million unique visitors daily, and over 98 million daily page views. Approximately 5.1% of AliExpress.com's visitors are from the United States. AliExpress.com is the 151st most visited site in the United States, ranking above popular sites such as Weather.gov and Tmz.com.[33]

---

[31] *Alibaba.Com*, Alexa.com, http://www.alexa.com/siteinfo/alibaba.com (last visited December 1, 2015); *Top Sites in the United States*, Alexa.com (last visited December 1, 2015); http://www.alexa.com/topsites/countries;11/US.

[32] *Alibaba Expo,* ALIBABA WEBSITE, (last visited December 2, 2015), available at: http://globalexpo.alibaba.com/?spm=a2700.7224109.a271qf.14.ogFXwY&tracelog=beacon_expo_150820.

[33] *Aliexpress.Com – Info*, Hypestat.com, http://aliexpress.com.hypestat.com (last visited July 8, 2015); *Top Sites in the United States*, Alexa.com, http://www.alexa.com/siteinfo/aliexpress.com; http://www.alexa.com/topsites/countries;6/US (last visited December 1, 2015).

62.     On information and belief, AliExpress is marketed to consumer in the United States "Launched in April 2010, AliExpress is a global retail marketplace targeted at consumers worldwide, many of them located in Russia, Brazil, and the United States." [34]

63.     On information and belief, Taobao.com receives an estimated 31 million unique visitors daily, and an estimated 291 million daily page visitors.  Approximately 1.3% of visitors on Taobao.com are from the United States.  Taobao.com is the 181st most visited site in the United States, ranking, by comparison, above popular sites such as NBA.com, Thesaurus.com, and Ticketmaster.com, which rank 240th, 208th, and 199th, respectively. [35]

64.     On information and belief, there are approximately 2.9 million Chinese speakers in the United States, including more than 300,000 Chinese speakers in Texas, according to the latest census figures.

65.     On information and belief, Taobao.com's official mobile app is available for download in the United States.

66.     On information and belief, Alibaba maintains places of business in the United States, including at least the following offices in the United States: (1) Alibaba Group maintains data center and logistics facilities in the United States; [36] (2) Alibaba, Inc. has an office in Santa Clara, California, with its address listed as 400 S. El Camino Real, Suite 400, San Mateo CA 94402; [37] (3) Alibaba Inc. has a registered agent at 160 Greentree Drive, Suite 101, Dover,

---

[34] *About Our Businesses*, ALIBABA GROUP WEBSITE (last visited November 30, 2015), available at: http://www.alibabagroup.com/en/about/businesses.

[35] *Taobao.com – Info*, Hypestat.com, http://taobao.com.hypestat.com (last visited December 1, 2015); *Taobao.com*, Alexa.com, http://www.alexa.com/siteinfo/taobao.com (last visited December 1, 2015); *Top Sites in the United States*, Alexa.com, http://www.alexa.com/siteinfo/aliexpress.com; http://www.alexa.com/topsites/countries;8/US (last visited December 1, 2015).

[36] *Our Offices*, AlibabaGroup.Com, http://www.alibabagroup.com/en/contact/offices (last visited July 8, 2015); *see also* Shira Ovide, *Alibaba Opens Data Center in Silicon Valley*, Wall St. J. (Mar. 4, 2015), *available at* http://www.wsj.com/articles/alibaba-opens-data-center-in-silicon-valley-1425485151.

[37] *Our Offices*, AlibabaGroup.Com, http://www.alibabagroup.com/en/contact/offices (last visited December 1, 2015).

Delaware 19904;[38] (4) Alipay has an office in Santa Clara, California, with its address listed as 3945 Freedom Circle, Suite 600, Santa Clara, California 95054;[39] (5) in June 11, 2014, the Alibaba Defendants launched 11main.com, a United States invite-only consumer marketplace and English-language site;[40] (6) United States specialty shops and boutiques sell their products on 11main.com to United States buyers;[41] (7) 11main.com is headquartered in California, with its address listed as 360 East 6th Street, Chico, California, 95928.  In June 2015, the Alibaba Defendants announced that they are selling 11main.com to the New-York based company OpenSky—an online-marketplace operator—in exchange for a 37.5% stake in OpenSky;[42] (8) in March 2015, Alibaba, through its "cloud-computing subsidiary" Aliyun, opened its first U.S. data center, partnering with U.S.-based global data center Equinix;[43] (9)  According to Alibaba, expansion into California's Silicon Valley marked the company's entry into the U.S. market by "planting a flag in the U.S. and marking the company's first expansion overseas;"[44] (10) In March 2015, Alibaba began hiring employees for its U.S. headquarters in Seattle, Washington.[45]

67.    On information and belief, Alibaba has made substantial investments in companies in the United States including: (1) in March 2014, Alibaba Group purchased a 20% equity interest

---

[38] State of Delaware, Division of Corporations, Entity Details, Alibaba.com, Inc., File No. 3182637, *available at* https://delecorp.delaware.gov/tin/GINameSearch.jsp.

[39] *Contact*, Alipay.com, http://ab.alipay.com/i/lianxi.htm (last visited July 8, 2015).

[40] Ryan Mac, *Alibaba Launches 11 Main To Grow U.S. Presence Before Its Record American IPO*, Forbes, June 11, 2014, *available at* http://www.forbes.com/sites/ryanmac/2014/06/11/alibaba-launches-11-main-to-grow-u-spresence-before-its-record-american-ipo/.

[41] Juro Osawa & Eva Doe, *Alibaba Stumbles in U.S. Online Market*, Wall St. J., June 23, 2015, *available at*
http://www.wsj.com/articles/alibaba-sells-u-s-subsidiary-11-main-to-opensky-1435027883.

[42] *Id*.

[43] *Aliyun Gets Cloud Services on the MAP with Global Partnership Program*, Alizila (Jun. 8, 2015) available at: http://www.alizila.com/aliyun-gets-cloud-services-map-global-partnershipprogram?utm_source=twitterfeed&utm_medium=twitter.

[44] *Alibaba Opens Its First U.S. Cloud Data Center*, Alizila (Mar. 4, 2015), http://www.alizila.com/alibaba-opensits-first-us-cloud-data-center-0#sthash.OF5cAsr6.dpuf.

[45] Paul Carsten & John Ruwitch, *Alibaba hiring in Amazon, Microsoft backyard as U.S. cloud unit expands*, Reuters (Mar 12, 2015), http://www.reuters.com/article/2015/03/12/us-alibaba-group-hiring-usaidUSKBN0M810920150312.

(on a fully-diluted basis) in TangoMe, Inc., "a leader in mobile messaging services based in the United States" for $200 million.  In April 2014, Alibaba Group invested an additional $17 million in TangoMe, Inc. to maintain its 20% equity interest;[46]  Tango maintains a critical presence in Austin, Texas;[47] 2) in March 2014 (and announced on April 2, 2014), Alibaba Group participated in a $250 million fund-raising round for Lyft, "one of the big players in the nascent-but-booming ride-sharing industry" and a main competitor of Uber;[48] (3) in January 2014, Alibaba Group invested $15 million in 1stdibs, a "New York based luxury e-commerce site" that "links more than 1,500 international dealers of high-end antiques, vintage furniture and design, art, jewelry, fashion and homes to consumers;"[49] (4) in the nine months ended December 31, 2013, Alibaba Group acquired shares in ShopRunner, a U.S. company which "operates an online platform for buyers." Alibaba Group invested $202 million for a 39% equity interest in the company;[50] (5) in May 2015, Alibaba acquired a 9.3% stake—valued at more than $150 million49—in zulily inc., a U.S. online retailer and Delaware corporation.[51]

   68. On information and belief, Alibaba entities operate as a single unit, sharing common ownership, the Alibaba Group, and a unity of interest, "to make it easy to do business anywhere."[52]  Indeed, according to Alibaba Group's Form F-1, Alibaba Group "operate[s] our Internet businesses and other businesses in which foreign investment is restricted or prohibited in

---

[46] F-1 at 91.

[47] Gerry Shih, *Alibaba Invests $280 million In Messaging App Tango*, REUTERS NEWS (March 20, 2014), available at: http://www.reuters.com/article/2014/03/20/us-tango-alibaba-group-investment-idUSBREA2J05B20140320.

[48] Michael J. de la Merced, *Lyft Raises $250 Million From Alibaba, Third Point and Others*, NYTimes.com (April 2, 2014), http://dealbook.nytimes.com/2014/04/02/lyft-raises-250-million-from-alibaba-third-point-and-others/.

[49] *Alibaba invests $15m in 1stdibs*, 27 Asian Venture Capital J. 4, (Jan. 28, 2014), *available at* http://www.avcj.com/avcj/news/2325087/china-s-alibaba-group-makes-usd15-million-investment-in-1stdibs.

[50] F-1 at F-59.

[51] *See* Schedule 13G, filed with SEC on May 15, 2015 (reporting zulily, inc., the issuer, May 6, 2015 transaction with Alibaba).

[52] F-1 at 1.

the PRC through wholly-foreign owned enterprises, majority-owned entities and variable interest entities . . . These contractual arrangements collectively enable us to exercise effective control over, and realize substantially all of the economic risks and benefits arising from, the variable interest entities."[53]  Alibaba Group defines the terms "we," "us," "our company," and "our" as including "Alibaba Group Holding Limited and its consolidated subsidiaries and its affiliated consolidated entities, including our variable interest entities and their subsidiaries."[54]  As set forth in Alibaba Group's Form F-1, the Alibaba entities constitute "one single operating and reportable segment, namely the provision of online and mobile commerce and related services" and Alibaba does "not allocate operating costs or assets to its business units."[55]  Accordingly, the Alibaba entities operate as a single unit and each of the Alibaba entities is an agent of the other Alibaba entities.  Many of the Alibaba entities have common board members, employees, and leadership, although the full extent is not determinable with reference to public documentation.  The Alibaba Group controls the other Alibaba entities, *i.e.*, their marketing and operational policies.  Certain Alibaba entities have maintained common office space and addresses, *i.e.*, Alibaba.com and Alipay shared an address at 3945 Freedom Circle, Suite 600, Santa Clara, California 95054.  On information and belief, the Alibaba entities subsidiaries are financially dependent on their parent, the Alibaba Group.  Further, the Alibaba entities' "operating philosophy is to manage [its] various business units to a single profit and loss, or 'P&L,' rather than setting compartmentalized P&L targets for each business unit."[56]  Alibaba does not "manage [its] business by allocating revenue among individual marketplaces or business units."[57]  The Alibaba Group similarly "does not allocate operating costs or assets across business units."[58]

---

[53] F-1 at 9.

[54] F-1 at 11.

[55] F-1, Note 2(f) to Audited Financials at F-18.

[56] Alibaba Group Holding Limited Form 20-F Annual Report for fiscal year ended March 31, 2015, filed with the U.S. Securities and Exchange Commission on June 25, 2015 ("20-F") at 95.

[57] 20-F at 96.

[58] 20-F at F-18.

69.     On information and belief rather than setting financial targets for individual businesses or managers, Alibaba asks its managers "to be accountable for operating metrics that reflect the health of [its] marketplaces and the contribution of their units to [its] entire business."[59]

70.     On information and belief, Alibaba Ltd. is a "significant subsidiar[y]" of the Alibaba Group.  The Alibaba Group has publicly stated that Alibaba Ltd. operates "Alibaba.com, 1688.com and AliExpress."  Alibaba Ltd. claims that it has registered or otherwise possesses trademark rights in the terms "Gold Supplier" and "Trustpass," as well as related logos and icons, in "various jurisdictions" and can enforce those rights under "applicable copyright, trademark and other proprietary rights laws."  Alibaba Ltd. uses these trademarks to promote the success and profitability of the Alibaba Marketplaces.[60]

71.     For example and without limitation, "[r]evenue from [Alibaba's] global wholesale marketplace is primarily generated from the sale of . . . Gold Supplier memberships on Alibaba.com," and the "Gold Supplier" icon signals to buyers that Alibaba.com has investigated the merchant, has confirmed that goods sold by the merchant are lawful and legitimate, and is vouching for the merchant's alleged authenticity.[61]

72.     On information and belief, Alibaba Investment Holding is a "significant subsidiar[y]" of the Alibaba Group.[62]

73.     On information and belief, Alibaba Investment is a "significant subsidiar[y]" of the Alibaba Group.[63]

74.     On information and belief, Alibaba Technology is a subsidiary of the Alibaba Group that is "primarily involved in the operation of Alibaba.com, 1688.com and AliExpress."

---

[59] 20-F at F-18.

[60] 20-F at 52, 95& F-13; *Terms of Use*, Alibaba.com, http://rule.alibaba.com/rule/detail/2041.htm (last visited December 1, 2015); *Free Membership Agreement*, Alibaba.com, http://rule.alibaba.com/rule/detail/2042.htm (last visited December 1, 2015).

[61] F-1 at 85.

[62] 20-F at 52.

[63] *Id.*

Alibaba Technology has achieved "major taxable profits" and received a favorable taxation status (recognition as a "High and New Technology Enterprise and Key Software Enterprise") which entitled it to an income-tax exemption for two years after its first profitable year and a 50% reduction for the subsequent three years.  As such, its Enterprise Income Tax rate was 10% in those years.[64]

75.    On information and belief, Taobao Holding is a "significant subsidiar[y]" of the Alibaba Group.[65]

76.    On information and belief, Taobao China Holding is a "significant subsidiar[y]" of the Alibaba Group.  The Alibaba Group has publicly stated that Taobao China Holding is the "operating entity for the overseas business of [Alibaba's] Taobao Marketplace."[66]

77.    On information and belief, Taobao Software is a "significant subsidiar[y]" of the Alibaba Group that is "primarily involved in the operation of the Taobao Marketplace."  Taobao Software is also an indirect subsidiary of Taobao Holding.  Taobao Software has achieved "major taxable profits" and received a favorable taxation status (recognition as a "High and New Technology Enterprise" and recipient of "Software Enterprise status") which entitled it to an income-tax exemption for two years after its first profitable year in 2010 and a 50% reduction for three years beginning in 2012.[67]

78.    On information and belief, Alibaba's Enterprise Income Tax rate was 10% in 2012, 2013, and 2014.

79.    Taobao Software "develops software applications for the Apple iPhone, iPad, and iPod."  Mobile applications have become an increasingly substantial source of revenue for the

---

[64] 20-F at 86 & 52, F-50.

[65] 20-F at 52.

[66] *Id*.

[67] 20-F at 52, 86 & F-50; *see also* F-1 at F-37.

Alibaba Defendants, and play a central role in the Alibaba Group's plans to "grow and enhance [its] ecosystem."[68]

80.    On information and belief, Alibaba has caused its stock to be listed on the New York Stock Exchange in an Initial Public Offering that raised approximately $25 billion.  On information and belief, a significant reason that the Alibaba entities' IPO was so successful was that the Alibaba entities offered investors the opportunity to invest in the Alibaba entities collective enterprise as a single unit, including but not limited to the representations listed above.

81.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).  One or more of the Alibaba entities is registered to do business in Texas, and upon information and belief, has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas.

## TECHNOLOGY BACKGROUND

82.    Advances in computational power and the explosive growth of the internet have led to the development of data analytics systems for accurately recommending content and products to internet users.  The '282 patent teaches specific automated collaborative filtering ("Automated CF" or "ACF") technologies for recommending products and content to users of the internet.

83.    Alibaba's competitors have confirmed the importance and value of collaborative filtering systems to providing accurate recommendations.

---

[68] *Company Overview of Taobao (China) Software Co., Ltd.*, Bloomberg Business, http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=126828966 (last visited Sept. 1, 2015).

According to Welington Fonseca, VP of marketing and digital analytics, "Gilt's commitment to a personalized experience is evident when customers return to the home page of the web site or mobile app. Sales within the store (men, women, kids, home) with the highest affinity to a consumer's past behavior and preferences (browse, purchase, favorite brands, wish list) are presented at the top of their home page with all other sales ranked according to relevance based on previous shopping behavior and collaborative filtering."

Another example of personalization is "Your Personal Sale," which displays the most relevant brands and products based on shopping patterns and self-stated preferences and provide Gilt with another way to interact with the customer to understand preferences in order to further refine their personalization algorithm.

Eman Roman, *Why You Need Human Data for Real Customer Engagement*, SAP BUSINESS INNOVATION BLOG, February 27, 2015, http://blogs.sap.com/innovation/sales-marketing/why-need-human-data-customer-engagement-02271337 (emphasis added).

84.     Although content and product recommendations on websites are commonplace today, at the time the inventions disclosed in the '282 patent were conceived, an advanced system for recommending products and content automatically utilizing variables (*e.g.*, multiple users, product ratings, purchase history, and/or actions of website users) was novel.

85.     Alibaba executives have repeatedly stated data analytics systems such as those taught in the '282 patent are unique to a networked computer environment and the internet.

> Taobao, a subsidiary of Alibaba, generates data of tens of terabyte (TN) on online trading per day.  While the amount of large datasets , is drastically rising, **it also brings about many challenging problems demanding prompt solutions**. . . . . the collected data is increasingly growing which *causes a problem of how to store and manage such huge, heterogeneous datasets with moderate requirements on hardware and software infrastructure* . . . in consideration of the heterogeneity, scalability, realtime, complexity, and privacy of big data, we shall effectively "mine" the data sets at different levels with analysis, modeling, visualization, forecast, and optimization techniques, so as to reveal its intrinsic property and improve decision making.

Min Chen, Shiwen Mao, Yin Zhang, Victor CM Leung, *Big Data: Related Technologies*, CHALLENGES AND FUTURE PROSPECTS 1 (2014) (emphasis added).

> Then, in accordance with user preferences, it recommends, in a targeted manner, specific information that might be of interest to users. *Such a recommendation method can significantly improve users' experiences in e-*

> ***commerce information transactions***. It can increase the accuracy of seller exposure and effectively lead users into becoming buyers, thereby lowering transaction costs.

U.S. Patent No. 8,843,484, *Recommending Content Information Based On User Behavior* (issued September 23, 2014) (emphasis added) (This patent is assigned to Alibaba Group Holding Limited. In addition 16 of 17 patents cited as prior art in the prosecution of this patent cite Mr. Robinson's patent as prior art either in their patent applications or in the patents cited as prior art in the patents cited.).

86.    The claims in the '282 patent describe a solution that is unquestionably rooted in computer technology to overcome a problem specific to and characteristic of computer networks.

> Today increasing numbers of people are turning to computational *recommender systems*. ***Emerging in response to the technological possibilities and human needs created by the World Wide Web***, these systems aim to mediate, support, or automate the everyday process of sharing recommendations.[69]

87.    The Tapestry system, developed in 1992, introduced the idea (and terminology) of collaborative filtering.[70] Tapestry was developed at Xerox's Palo Alto Research Center and was directed to electronic mail filtering. Tapestry was based on identifying relevant email content based on exploiting explicit feedback (ratings and annotations) of other users. Tapestry stored the contents of messages, along with metadata about authors, readers, and responders. It allowed any user to store annotations about messages, such as "useful survey" or "Gary should see this!" Tapestry users could form queries that combined basic textual information (*e.g.*, contains the phrase "recommender systems") with semantic metadata queries (*e.g.*, written by Gary OR replied to by Joe) and annotation queries (*e.g.,* marked as "excellent" by Chris).

88.    The development of the first collaborative filtering system was directly motivated by the need to sort electronic content transmitted over the internet (*e.g.*, electronic messages posted

---

[69] Loren Terveen & Will Hill, *Beyond Recommender Systems: Helping People Help Each Other*, in HCI IN THE NEW MILLENNIUM 2 (Jack Carroll, ed., Addison-Wesley, 2001) (emphasis added).

[70] David Goldberg, David Nichols, Brian M. Oki, & Douglas Terry, *Using Collaborative Filtering to Weave an Information Tapestry*, COMMUNICATIONS OF THE ACM 35 No. 12, 61–70 (1992) (One of the first uses of the term "collaborative filtering" can be found in this paper.).

to newsgroups).  "The motivation for Tapestry comes from the increasing use of electronic mail, which is resulting in users being inundated by a huge stream of incoming documents."[71]

89.     Although widely adopted today, in the 1990's, collaborative filtering was a groundbreaking technology offering significant benefits over existing recommendation systems that were content based ("content-based filtering").  Content-based filtering made recommendations based on the content of a document.  The creators of Tapestry described this break from prior systems:

> Collaborative filtering is **novel because it involves the relationship between two or more documents**, namely a message and its reply, or a document and its annotations.  Unlike current filtering systems, Tapestry filters cannot be computed by simply examining a document when it arrives, but rather require (potentially) repeatedly issuing queries over the entire database of previously received documents.  This is because sometime after a document arrives, a human (say Smith) may read that document and decide it is interesting.  At the time he replies to it (or annotates it), you want your filter to trigger and send you the original document.[72]

90.     Tapestry illustrates the limitations present in systems contemporaneous to the '282 patent.  Tapestry lacked the ability to recommend content automatically based on similarities between users.  Instead, the Tapestry system worked by recommending content based on predefined filters set by a second user.[73]  For example, if a user wanted to prioritize messages relating to "Bakersfield, California" the system would return all messages that had previously been "tagged" by prior users as relating to "Bakersfield, California."

91.     The below images show the Tapestry system prioritized content based on users requesting content previously tagged by another user of the Tapestry system.

---

[71] *Id.*

[72] *Id.* at 61 (emphasis added).

[73] The Tapestry system was similar in many ways to Mr. Robinson's earlier 1980's matching system utilized in the Relationship Matching Service.



Fig. 1 (images of the Tapestry System (explanation added in blue)).[74]

92.    Another early collaborative filtering system contemporaneous to the '282 patent

was GroupLens.  Started in 1994 by researchers at the Massachusetts Institute of Technology and

later the University of Minnesota, the GroupLens system implemented a collaborative filtering

system for rating Usenet newsgroup articles.[75]  To make personalized predictions identifying the

most useful Usenet articles to a user, the GroupLens system asked each user to enter a 1 to 5 rating

after reading an article.  GroupLens collected the ratings data in a database and compared these

ratings to find users who shared similar tastes.  Users of GroupLens were then provided a

predictive rating for unread Usenet articles.  The predictive rating was based on other users who

shared similar taste with the user.

---

[74] Douglas B. Terry, *A Tour Through Tapestry*, in PROCEEDINGS OF THE CONFERENCE ON ORGANIZATIONAL COMPUTING SYSTEMS 21-30 (Simon Kaplan ed. 2003).

[75] Paul Resnick et al., *GroupLens: An Open Architecture for Collaborative Filtering of Netnews*, in PROCEEDINGS OF ACM 1994 CONFERENCE ON COMPUTER SUPPORTED COOPERATIVE WORK 175—86 (1994).



Fig. 2 (showing the user interface for GroupLens and the ability to rate articles 1-5).[76]



Fig. 3 (showing the architecture of the GroupLens system).[77]

93.    GroupLens illustrates limitations in automated filtering systems contemporaneous to the '282 patent.  The GroupLens system used the Pearson correlation to calculate similarities between users and used the similarities between users to generate predictive ratings.  The Pearson correlation coefficient is calculated by comparing ratings for all items rated by both the target user

---

[76] *Id*. at Fig. 3.

[77] *Id*. at Fig. 2.

and the neighbor (*e.g.*, correlated items). The equation below gives the formula for the Pearson correlation between user "u" and neighbor "n," where CRu,n. denotes the set of correlated items between u and n.

$$userSim(u, n) = \frac{\sum_{i \subset CR_{u,n}} (r_{ui} - \bar{r_u})(r_{ni} - \bar{r_n})}{\sqrt{\sum_{i \subset CR_{u,n}} (r_{ui} - \bar{r_u})^2} \sqrt{\sum_{i \subset CR_{u,n}} (r_{ni} - \bar{r_n})^2}}$$

94.    The Pearson correlation and contemporaneous systems to the '282 patent failed to incorporate agreement about content in the population as a whole. For instance, the system failed to account for the fact that two users' agreement about a universally loved movie was less important than agreement on a controversial or unpopular movie. The Pearson correlation failed to capture distinctions relating to an item's general popularity. Thus, GroupLens made predictions based on data that showed similarities (arising from a piece of content being generally popular) but GroupLens' recommendations were not statistically significant.

95.    John Hey's patents (U.S. Pat. Nos. 4,996,642 and 4,870,579), which are cited on the face of the '282 patent, describe a system for recommending items based on ratings of the items. Like GroupLens and other systems contemporaneous to the '282 patent, Hey's system for recommending products based on user ratings failed to account for statistically significant similarities between certain users; the recommendations were merely the product of an item or piece of content being generally popular. This prevented the Hey system from offering accurate predictions and recommendations of items and content.

96.    Similarly, the Ringo music recommendation system, discussed by Upendra Shardanand and Pattie Maes, and cited on the face of the '282 patent, used Pearson's correlation measure to provide content and product recommendations. Like other systems contemporaneous to the '282 patent, Shardanand and Maes's system failed to take into account the statistically

significant similarities between certain users.[78]  Information showing unusual similarity in preferences for particular users was unutilized.  Furthermore, these prior art systems did not provide recommendations with statistically meaningful confidence levels as the number of items that both the user and a respective recommending user provided ratings for increased.

97.    Collaborative filtering arose to solve problems faced by digital content providers in the internet era, as described by Adobe's Global Alliance Manager, Jamie Brighton:

> The catalyst for the evolution of personalization has been competition through, a product of the Internet's explosive growth.  This growth provided consumers with so many options for e-commerce that it created a market in desperate need of a process by which consumers could develop a personal connection with a brand or digital storefront in a sea of rapidly evolving competitors.[79]

98.    At the time the inventions disclosed in the '282 patent were conceived, the internet and the state of technology generally was vastly different from 2015, or even the state of the internet 10 years ago.  For example, Facebook.com, YouTube.com, Wikipedia.com, and LinkedIn.com were years from being launched.[80]  Alibaba Online was not launched until 1999.[81]

---

[78] Upendra Shardanand & Pattie Maes, *Social Information Filtering: Algorithms for Automating Word of Mouth*, in PROCEEDINGS OF CHI '95 CONFERENCE ON HUMAN FACTORS IN COMPUTING SYSTEMS 210—17 (1995).

[79] Jamie Brighton, *Changes in Personalization and What's Coming Next*, ADOBE DIGITAL MARKETING BLOG, October 21, 2014, http://blogs.adobe.com/digitalmarketing/personalization/personalization-past-present-future/.

[80] Rob Waugh, *Before They Ruled the Internet: 'Ancient' Home Pages for Amazon, Google and 'The Facebook' Show Much Web Giants Have Changed*, DAILY MAIL, January 19, 2012, http://www.dailymail.co.uk/sciencetech/article-2088445; TONY SEBA, WINNERS TAKE ALL – THE 9 FUNDAMENTAL RULES OF HIGH TECH STRATEGY 137 (2006); GEORGE A BARNETT, ENCYCLOPEDIA OF SOCIAL NETWORKS 947 (2011).

[81] Alibaba Group History, Alibaba Website (last visited December 2, 2015), available at: http://www.alibabagroup.com/en/about/history.

The above images show major internet properties contemporaneous (and later) to the inventions conceived in the '282 patent, including: Google.com (September 1998), Yahoo.com (March 1995), Amazon.com (1995), Myspace.com (August 2003).[82]

99.     Malcom Gladwell, New Yorker Magazine writer and speaker at TIBCO's 2014 User Conference,[83] described TIBCO as developing tools directed toward the unique problems and capabilities of the internet.

> This sense of urgency is of course at the core of a company like TIBCO.  This is a company that at its core is a company that can make you see data in real-time.  But that [sic] is more than simply a technological capability, rather having to see data in real-time is not enough you have to have a need to see it

---

[82] *Id.*

[83] Malcom Gladwell was a paid speaker at 44O's 2014 User Conference.  *See Malcom Gladwell Profile*, SHAMEPROJECT WEBSITE (2014), http://shameproject.com/profile/malcolm-gladwell-2/ (describing Mr. Gladwell's speaker fees); *see also Malcom Gladwell Disclosure Statement*, MALCOM GLADWELL WEBSITE, http://gladwell.com/disclosure-statement/; *Malcom Gladwell Speaker Profile*, CELEBRITY SPEAKERS BUREAU WEBSITE, http://www.celebrityspeakersbureau.com/talent/malcolm-gladwell/.

in real time you have to want to you have to be motivated to use data in real time. In other words the effectiveness of that kind of data begins with an attitude….Transformation beings with an attitude a way of looking at the world.

Malcolm Gladwell, TIBCO NOW 2014: THE RIGHT ATTITUDE (2014), https://www.youtube.com/watch?v=zIfdIJR309c.

100.    The inventions disclosed in the '282 patent are directed toward solving a problem, recommendations based on user preferences in the era of big data, that are unique to the internet era. TIBCO's founder, Vivek Ranadivé describes the unique challenges of the internet as:

[I] think the 21st century was a little behind schedule and started in 2012 when you saw all kinds of crossover points, more cell phone and landlines, more laptops and tablets, than desktops. . . . It was also the year my daughter graduated from high school and hers became the first generation that was brought up on the web, the first for whose entire life the first truly digital native generation. Now in order to understand how to thrive in the 21st century it is important to understand the forces that are driving this new generation.

Vivek Ranadivé, *TUCON 2013*, INTRODUCTORY REMARKS AT TIBCO ANNUAL USER CONFERENCE, December 5, 2013, https://www.youtube.com/watch?v=UnpVDtrvj8E.

101.    Academics such as Daniela M. Witten of the University of Washington describe the development of collaborative filtering systems as directed to solving problems arising out of so called Big Data (a term for modern networked computers that capture considerable volumes of data).

Collaborative filtering is one example of a statistical method that has been newly-developed in the context of Big Data, in order to answer a question that didn't arise with Small Data. Collaborative filtering systems are used by companies like Amazon to suggest to a customer items that he or she might want to purchase, based on his or her past purchase history as well as purchases made by other customers.[84]

102.    Collaborative filtering systems, such as the system taught in the '282 patent were directed to solving a problem unique to the internet using uniquely computer based technologies.

---

[84] Nicholas Bashour, *The Big Data Blog, Part II: Daniela Witten*, AAAS NEWS, March 17, 2014, http://www.aaas.org/news/big-data-blog-part-ii-daniela-witten.

> Computers and the web allow us to advance beyond simple word-of-mouth. Instead of limiting ourselves to tens or hundreds of individuals the Internet allows us to consider the opinions of thousands. The speed of computers allows us to process these opinions in real time and determine not only what a much larger community thinks of an item, but also develop a truly personalized view of that item using the opinions most appropriate for a given user or group of users.

J. Ben Schafer, Dan Frankowski, Jon Herlocker & Shilad Sen, *Collaborative Filtering Recommender Systems*, in THE ADAPTIVE WEB: METHODS AND STRATEGIES OF WEB PERSONALIZATION 292 (Peter Brusilovsky *et al*. eds., 2007).

103.    On information and belief, contemporaneous to, and following Mr. Robinson's conception of the inventions disclosed in the '282 patent, academics, and businesses headquartered in Texas actively entered the field of collaborative filtering.  Computer researchers at the University of Texas at Austin founded the Intelligent Data Exploration and Analysis Laboratory and the Machine Learning Research Group.  The University of Texas at Dallas founded the Institute of Data Analytics, a center for research on data analysis, which collaborates with private industry.  Baylor University in Waco, Texas is the home of the Electronic Commerce Center, which focuses on integrating technology and electronic data with e-commerce.

104.    Texas based companies incorporated collaborative filtering technologies into numerous products and many of these same companies cited the '282 patent in their own patents.  Texas based businesses that developed products incorporating collaborative filtering included: VideosDotCom, Inc. of McKinney, Texas; i2 Technologies US, Inc. of Dallas, Texas; Vignette Corporation of Austin, Texas; Texas Shopper Network, Inc. of Houston, Texas; Arrowsmith Technologies, Inc. of Austin, Texas; and HP Enterprise Services, LLC of Plano, Texas.

105.    The '282 patent is cited by at least 60 patents that were either initially assigned to or are currently assigned to entities headquartered in Texas.  Companies citing the '282 patent in their patents include i2 Technologies, Vignette Corporation, AT&T, Hewlett-Packard Development Company, and Blockbuster LLC.

## THE VALUE OF MR. ROBINSON'S INVENTION

106.    Executives at leading technology companies have described the value of accurate product and content recommendations as critical, lasting, and prominent. Jamie Brighton, Global Alliance Manager at Adobe, stated accurate recommendation techniques were "a light switch for innovators and marketers alike, as well as a warning. A warning that personalization was rapidly becoming the ultimate avenue for creating lasting partnerships with a digital consumer base, and that ignoring this technology simply wouldn't be an option forever."[85]

107.    An IBM developerWorks® paper described the importance of providing accurate recommendations.

> Recommendation systems changed the way inanimate websites communicate with their users. Rather than providing a static experience in which users search for and potentially buy products, recommender systems increase interaction to provide a richer experience. Recommender systems identify recommendations autonomously for individual users based on past purchases and searches, and on other users' behavior.[86]

108.    Numerous companies have confirmed the value of providing accurate product recommendations. "By showing the visitor the content they are looking for, you increase conversion rates and reduce bounce rates."[87] Companies such as HP, RichRelevance, and Adobe confirm the importance of collaborative filtering technologies to generating accurate recommendations.

> With these concerns in mind, RichRelevance based the enRICH platform on multiple recommendation strategies, ranging from simple categorical top sellers, to collaborative filtering algorithms . . . . After deploying the enRICH

---

[85] Jamie Brighton, *Changes in Personalization and What's Coming Next*, ADOBE DIGITAL MARKETING BLOG, October 21, 2014, http://blogs.adobe.com/digitalmarketing/personalization/personalization-past-present-future/.

[86] M. Tim Jones, *IBM Developer Works: Recommender Systems, Part 1: Introduction to Approaches and Algorithms* 2 (December 12, 2013), *available at* http://www.ibm.com/developerworks/library/os-recommender1/.

[87] *Cognitor: Content Guidance and Recommendations* 2, COGNITOR WEBSITE, April 15, 2015, http://www.cognitor.com/brochures/enterprise.pdf.

platform, retail customers report improvements across a range of KPIs, including increased conversion, revenue, and repeat visits.[88]

In its simplest form, collaborative filtering really works when data from multiple sources comes together and is sorted into categories. *It is a must these days* for any e-commerce site striving to deliver a basic level of website personalization.[89]

Personalized services are becoming increasingly indispensable on the Web, ranging from providing search results to product recommendation.  Examples of such systems include recommending products at Amazon.com, DVDs at Netflix, News by Google etc.  The central technique used in these systems is collaborative filtering (CF) which aims at predicting the preference of items for a particular user based on the items previously rated by all users.[90]

The truth is indisputable—optimization increases conversion, so every digital property needs optimization.  This singular truth is transforming the practice of marketing.  Now, marketers must tap into the constant stream of web activity and customer data to gain insight into what visitors and customers want to see and experience. *They must immediately act on that insight and deliver highly relevant, personalized content* throughout the customer life cycle.[91]

Dynamic, relevant content is proven to increase engagement and conversions by as much as 6 times when compared to static content.[92]

### U.S. PATENT NO. 5,885,282

109.    Fellowship Filtering is the owner by assignment of the '282 patent.  The '282 patent

is entitled "Automated Collaborative Filtering System."  The '282 patent issued on March 16,

1999, based on a patent application filed on April 9, 1998, and claims priority to a provisional

---

[88] *Rich Relevance, Speak <geek> [sic] Technical Brief* 6 (2009), *available at* http://www.richrelevance.com/wp-content/uploads/2011/01/Speak-Geek2_EnsembleLearning_RichRelevance.pdf.

[89] Dan Darnell, *Collaborative Filtering and Its Importance to Personalized Recommendations in eCommerce*, BAYNOTE BLOG, April 18, 2013, http://www.baynote.com/2013/04/how-collaborative-filtering-impacts-product-recommendations/ (emphasis added).

[90] Rong Pang et al., *One-Class Collaborative Filtering*, in IEEE INTERNATIONAL CONFERENCE ON DATA MINING (ICDM 2008) 502—11 (2008) (Mr. Pang at the time was employed by Hewlett-Packard.).

[91] *Adobe Target Premium Overview* 1 (2014), *available at* http://www.adobe.com/content/dam/Adobe/en/solutions/testing-targeting/pdfs/target-premium-overview-ue.pdf (emphasis added).

[92] *BaynoteOne Product Recommendations* 1 (204), *available at* http://www.baynote.com/wp-content/uploads/2012/04/BaynoteONE-Solution-Brief-Personalized-Product-Recommendations.pdf.

application filed on April 30, 1996.  A true and correct copy of the '282 patent is attached hereto as Exhibit A.

110.    The claims in the '282 patent are directed at a unique computing solution that addresses a problem particular to computer networks – the recommendation of items or content based on prior user actions.

111.    Recommending content over a computer network presented new and extraordinary issues over the techniques and systems known in the art at the time.  Prior art recommendation systems had a number of drawbacks.  Such systems "fail to take into account the probability that a random user will provide a given rating.  Thus, information showing unusual similarity in preferences for particular users is not utilized."  '282 patent, cols. 1:67-2:4.

112.    The recommendation technologies claimed in the '282 patent were aimed at solving problems specific to the internet.  "The catalyst for the evolution of personalization has been competition though, a product of the Internet's explosive growth.  This growth provided consumers with so many options for e-commerce that it created a market in desperate need of a process by which consumers could develop a personal connection with a brand or digital storefront in a sea of rapidly evolving competitors." [93]

113.    The technology of "[c]ollaborative filtering is a relatively young algorithmic approach" and thus was not a conventional business practice. [94]

114.    One or more claims in the '282 patent recite a "similarity calculation."  This element of the '282 patent is one of the "inventive concepts" of the '282 patent.  The use of a similarity calculation is an "inventive concept" allowing computer servers configured to operate websites to more efficiently and accurately recommend content and products to website users.

---

[93] Jamie Brighton, *Changes in Personalization and What's Coming Next*, ADOBE DIGITAL MARKETING BLOG, October 21, 2014, http://blogs.adobe.com/digitalmarketing/personalization/personalization-past-present-future/.

[94] Yehuda Koren, *Tutorial on Recent Progress in Collaborative Filtering,* in PROCEEDINGS OF THE 2008 ACM CONFERENCE ON RECOMMENDER SYSTEMS (RECSYS '08) 333-334 (2008).

115.    The '282 patent does not preempt every way of "providing recommendations using a computer system," as systems for doing so existed before this invention, and systems exist now that allow website operators to provide recommendations without infringing the claims of the '282 patent.

116.    The '282 patent claims do not preempt the field or preclude the use of other effective recommendation technologies.  The '282 patent claims include inventive elements such as the use of probability calculations, randomized transformed ratings data, and/or similarity values to generate preference data over a computer network.  The elements in the '282 claims greatly limit the breadth of the '282 patent's claims.  These limitations are not necessary or obvious tools for achieving the generation of user preference data and/or recommendations, and they ensure that the claims do not preempt the field of recommendation systems and/or collaborative filtering.

117.    Other techniques for collaborative filtering that are not included within the scope of the '282 patent's claims include, but are not limited to, the prior art discussed in the '282 patent:

- U.S. Patent No. 4,870,579 to Hey teaches providing recommendations to a user based on a user selected from a group of users, the reactions of the selected user to items sampled by one or more users in the group but not sampled by the selected user.

- U.S. Patent No. 4,996,642 to Hey teaches providing recommendations to a user based on other items previously sampled by that user and on the availability of the item.  Further, the recommendations were represented by a scalar rating for each item.

- U.S. Patent No. 5,452,410 to Magidson teaches apparatus and methods for achieving statistical analysis of categorical and continuous outcomes and for displaying the results of such analyses.

- Upendra Shardanand, "Social Information Filtering for Music Recommendation" Sep. 1994, pp. 1-93, Massachusetts Institute of Technology, Thesis.  This system attempted to provide recommendations to a user based on ratings for items provided by the user as compared with other users.

118.    The '282 patent claims do not preempt the field of recommendation systems.  Technologies falling outside the scope of the '282 patent may include, but are not limited to, the

following: (1) filtering relying solely on content-based techniques, (2) collaborative filtering using only a standard *Pearson r* correlation coefficient, (3) collaborative filtering relying on the Mean Squared Difference, and (4) community-based recommendation systems.

119.   In contrast to the '282 patent, the patents at issue in *I/P Engine Inc. v. AOL Inc.*, claimed all instances of recommendation systems where content and collaborative filtering was used.  Judge Mayer, in his Federal Circuit concurring opinion wrote, "the scope of the claimed invention is staggering, potentially covering a significant portion of all online advertising."  *I/P Engine, Inc. v. AOL Inc.,* 576 F. App'x 982, 995 (Fed. Cir. 2014).  Further, despite the asserted patents (U.S. Patent Nos. 6,314,420 and 6,775,664 ("I/P Engine Patents")) claiming a priority date of 1998 (*Id.* at 997) and a specification 50% shorter than that of the '282 patent, the I/P Engine Patents' broad claims were upheld by the Patent and Trademark Office in two reexamination proceedings, by a jury following a 12 day trial, and by United States District Judge Raymond Alvin Jackson following significant post-trial briefing.  In contrast, the provisional application to which the '282 patent claims priority precedes the I/P Engine Patents' priority date by two years and contains significantly narrower claims.

120.   The '282 claims are not directed to any "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," nor "a building block of the modern economy."  Instead, the '282 patent's claims are limited to the realm of systems utilized in "calculating similarity values" and "recommending products and content" over a "computer network."

121.   The '282 patent's claims are not directed at the broad concept or idea of "recommending items."  Instead, the claims are directed to particular, narrow methods and systems for "providing recommendations by transforming user data," using technologies unique to the internet age.  The inventive concept in the '282 claims is a technological one rather than an entrepreneurial one – the development of systems and methods used to calculate content and/or product recommendations that are statistically significant, thus improving the accuracy of the content and/or product recommendations.

122.    The '282 patent does not take a well-known or established business method or process and "apply it to a general purpose computer."  Instead, the specific system and processes described in the '282 patent have no direct corollary to a business process that predates the advent of the internet.

123.    The '282 patent's claims are directed toward a solution rooted in computer technology and uses technology unique to computers and networks to overcome a problem specifically arising in the realm of making product and content recommendations over a computer network.  For example, the '282 patent's claims are directed toward generating recommendations using data collected in a database from users over the internet — a result that overrides the routine and conventional sequence for providing recommendations known in the art at the time the inventions disclosed in the '282 patent were conceived.

124.    The '282 patent's claims are not directed at a mere mathematical relationship or formula as the '282 patent's claims teach specific systems and methods for providing recommendations of content and products over a computer network using both data from prior users of a website as well as information created by the systems and methods described in the '282 patent's claims.

125.    The '282 patent's claims cannot be performed by a human, in mind, or by pen and paper.  The claims as a whole are directed to generating user preference data using a connection to the internet to gather data from users, a database to store user data, and a computer processor to conduct complex statistical calculations.  These limitations establish that the '282 patent's claims are not an abstract idea, because they cannot be performed by a human, in the human mind, or by pen and paper.

126.    Further, the '282 patent disclosure requires a computer to generate content and/or product recommendations.  For example, in block 90, the method disclosed in the '282 patent computes whether the similarity value is sufficient to generate preference data.  The result of the steps described in the '282 patent is a computer server using processing power to conduct complex

calculations over large data sets and creating new data used by the system to improve the quality of recommendations.



Fig. 4 (showing the implementation of the '282 patent system arose from receiving user data over the internet including through a website).[95]

127.    The use of probability calculations to generate user preference data is not a conventional, routine activity in which humans engage.

128.    The prior art cited on the face of the '282 patent further shows the invention claimed in the '282 patent is not a patent ineligible abstract idea.  The invention described in the '282 patent's claims is narrower than much of the cited prior art, and therefore, is not an abstract idea.  For example, U.S. Pat. Nos. 4,996,642 to Hey describes systems and methods that attempted to provide recommendations to a user based on ratings for items provided by the user as compared with other users.  The '282 patent's claims require additional limitations and thus the '282 patent's claims are directed toward significantly more than an abstract idea and the '282 patent's claims do not preempt the field of recommendation engines or even collaborative filtering.

---

[95] '282 patent, fig. 1.

129.    The claimed invention in the '282 patent's claims is rooted in computer technology and overcame a problem specifically arising in the realm of computer networks. The '282 patent's claims require the use of a computer system.

130.    The use of a computer system plays a significant part in performing the claims of the '282 patent. For example, the use of a computer processor to generate user preference data utilizing data stored in a computer database is integral to the success of the system, and can only be performed using a computer system. The use of a computer system to process user data stored in a database does far more than improve the efficiency of the process; the computer system is integral to accomplishing the generating of recommendation data.



Fig. 5 (showing the generation of recommendation data).[96]

---

[96] '282 patent, fig. 6.

131.    The rising volume of content and data made possible by the internet drives the need to identify relevant products and content using filtering technologies such as that disclosed in the '282 patent.

> With the development and popularity of WWW, billions of web pages are retrievable via search engines like Google.  Despite it is not a perfect method to find what we want, most search engines still use keywords in documents and queries to calculate the relevance.  As the only interface for users accessing tremendous web pages, queries are one of the most important factors that affects the performance of search engines.  However, web pages returned from search engines are not always relevant to user search intentions.  An independent survey of 40,000 web users found that after a failed search, 76% of them will try to rephrase their queries on the same search engine instead of resorting to a different one.[97]

132.    Dan Darnell, a Senior Director of Product Marketing at Baynote, similarly described collaborative filtering as directed to solving problems specific to the internet:

> In its simplest form, collaborative filtering really works when data from multiple sources comes together and is sorted into categories.  It is a must these days for any e-commerce site striving to deliver a basic level of website personalization.[98]

133.    Academics have recognized that the development of collaborative filtering recommendation systems is directly tied to and an outgrowth of information overload problems created by and unique to the internet.

> The challenge of finding the needed information from the web has led to the development of a number of recommender systems, which typically watch the user navigation behavior as a sequence of pages and suggest another set of web pages, products and other information besides the actual information.  With the exponential growth of the web, the study of modeling and predicting a user's access on the web has become crucial to the researchers and portal developers.[99]

---

[97] Zhiyuan Liu & Maosong Sun, *Asymmetrical Query Recommendation Method Based on Bipartite Network Resource Allocation*, in Proc. of WWW'08 1049 (2008).

[98] Dan Darnell, *Collaborative Filtering and Its Importance to Personalized Recommendations in eCommerce*, Intelligence Collected: The Baynote Blog, April 18, 2013, http://www.baynote.com/2013/04/how-collaborative-filtering-impacts-product-recommendations/ (Dan Darnell is a Senior Director of product marketing at Baynote).

[99] Gopinath Ganapathy & P.K. Arunesh, *Feature Analysis of Recommender Techniques Employed in the Recommendation Engines*, J. Comput. Sci. 6(7): 748—55 (2010).

To overcome this so called "information overload" problem, in the mid-1990s researchers started to investigate recommender systems. A recommender system (RS) uses knowledge about your preferences (and those of others) to recommend items you are likely to enjoy. Users can offer feedback on items they are familiar with for example, and the recommender system uses the information to predict their preference for yet unseen items and subsequently recommends items with the highest predicted relevance.[100]

134.    A 2009 paper supported by the Samsung Research Fund, ties collaborative filtering technologies to solving problems unique to the internet – the generation of information using a common communications infrastructure.

The amount of information on the Web is increasing according to the growth of information and communication infrastructure. As a result, recommender systems (RSs) for personalization are required. An RS provides content or items considering the tastes of individual users. Among the various RSs, collaborative filtering (CF) is the process of filtering for information or patterns using collaborative techniques involving multiple users.[101]

135.    Years after the Ringo system was developed (the Ringo system is referenced on the face of the '282 patent), the use of collaborative filtering techniques was described as "innovative" by data scientists.

Ringo also provides an innovative solution that inverts the basic CF approach; music albums are treated as 'participants' that can recommend users to other music album participants.[102]

136.    One or more of the '282 patent's claims relate to a computer-implemented method to transform website user data in a particular manner – by inserting information into user data and using the code to recommend content and/or products. This insertion enables the computer system to recommend content and/or products and generate similarity values.

---

[100] Joost de Wit, *Evaluating Recommender Systems -- An Evaluation Framework to Predict User Satisfaction for Recommender Systems in an Electronic Program Guide Context* 9 (May 2008), Master's thesis, University of Twente, http://essay.utwente.nl/59711/.

[101] Hyeong-Joon Kwon et al., *Improved Memory-based Collaborative Filtering Using Entropy-based Similarity Measures*, in SYMPOSIA AND WORKSHOPS ON UBIQUITOUS, AUTOMATIC AND TRUSTED COMPUTING (WISA'09) (May 2009) (this work was supported by Samsung).

[102] Sonny Han Seng Chee et al., *Rectree: An Efficient Collaborative Filtering Method*, in 3RD INT. CONF. ON DATA WAREHOUSING AND KNOWLEDGE DISCOVERY (DAWAK 2001) 141 (2001).

137.    One or more of the claims in '282 patent go beyond manipulating, reorganizing, or collecting data by actually adding information associated with a user and using that information to generate a recommendation of a product or content over a computer network, thereby fundamentally altering ratings data associated with a user.

138.    One or more of the claims in the '282 patent require 'transforming' data to generate "randomized ratings data" by "adding a uniformly distributed random number to the ratings data provided by the plurality of users."  Therefore, the claims in the '282 patent alter data associated with a user and go beyond the mere collection, organization, manipulation, or reorganization of data.  The claimed invention goes beyond manipulating, reorganizing, or collecting data by actually adding a new subset of numbers or characters to the data, thereby fundamentally altering the original information.

139.    One or more of the claims in the '282 patent requires 'transforming' one thing ('ratings data') 'to create' something else ('randomized ratings data') and further recites a particular manner of transforming ('by adding a uniformly distributed random number to the ratings data provided by the plurality of users').  Therefore, claimed features in the '282 patent "fundamentally alter" data or "transform" the data.

140.    Nor does collaborative filtering merely "support an existing activity."  Professor Loren G. Terveen of the University of Minnesota[103] and Will Hill of AT&T Labs described collaborative filtering as improving the functioning of computer-based recommendation systems by updating a computer database and transforming data.

> Collaborative filtering does not simply support an existing activity.  Instead, it requires users to engage in a somewhat novel computationally mediated activity.  This activity has a single combined role, the recommendation seeker / preference provider.  We describe this as *role uniformity*.  Everyone does the same work (rates items) and receives the same benefits (gets rated items as recommendations).  We might describe rating items as an "ante" – to get recommendations, you have to give them.  ***This leads naturally to growth in***

---

[103] Loren Terveen was a principal member of the technical staff at AT&T Labs.

> *the system's knowledge (and thus to better recommendations), since using the database leads to the database being updated*.[104]

141.    White papers from various corporations describe computer-implemented recommendation systems as transforming the data of a previously static website – generating preference information that previously did not exist.  Recommendation systems like the inventions disclosed in the '282 patent utilize a system for modifying data that has a concrete effect in the field of website and internet usage.

> Rather than providing a static experience in which users search for and potentially buy products, recommender systems increase interaction to provide a richer experience.   Recommender systems identify recommendations autonomously for individual users based on past purchases and searches, and on other users' behavior.[105]

142.    Further, the '282 patent claims improve upon the functioning of a computer system. "Performance improves as the number of entries in the database increases."  '282 patent, col. 23:29-30.  The claims and specification of the '282 patent also describe the use of "cluster analysis," which improves the functioning of a computer handling the making of recommendations.  "As a means for more efficient processing, cluster analysis can be used."  *Id.* 20:36-37.

143.    One or more of the claims of the '282 patent recite a means or step for performing a specified function.  The corresponding structure(s) in the '282 patent specification and appendix include computer code that improves the functioning of a computer by being more "RAM-efficient."  '282 patent, cols. 33:1-39:60.

144.    Academic research has confirmed that using ratings improves the functioning of a computer conducting collaborative filtering.

> One way to make recommendations of regular, but interesting items, more likely consists in assigning weights to items that devalue ratings given to

---

[104] Loren Terveen & Will Hill, *Beyond Recommender Systems: Helping People Help Each Other*, in HCI IN THE NEW MILLENNIUM 13 (Jack Carroll, ed., Addison-Wesley, 2001) (emphasis added).

[105] M. Tim Jones, *IBM Developer Works: Recommender Systems, Part 1: Introduction to Approaches and Algorithms* 2 (December 12, 2013), *available at* http://www.ibm.com/developerworks/library/os-recommender1/.

popular items and appreciate ratings given to regular items. . . . The results of the first set of experiments are shown in Fig. 5.  The precision@n values show that when using the weighting functions, the resulting precision@n is slightly higher for low values of n than for the unweighted approach for the Moviepilot dataset (n=5).   For the Movielens dataset, the unweighted approach seems to have the upper hand.   However, as n increases, the improvement decreases and at a relatively large n (n=50) the weighted approaches perform worse than the non weighted one.  In the Movielens case, the unweighted approach always outperforms the weighted ones, irrelevant of n's value.  This seems to be in agreement with the findings by Herlocker et al.  Results for the Euclidean and cosine measures showed very similar trends and have thus been omitted.[106]

145.    One or more of the claims in the '282 patent recite means-plus-function claim limitations governed by 35 U.S.C. § 112, ¶ 6.

146.    The '282 patent discloses computer algorithms in an appendix to the specification. In addition to the structures and algorithms disclosed throughout the specification, these algorithms correspond to means-plus-function claims in the '282 patent.



'282 patent, cols. 39-40 (computer algorithms disclosed in an appendix to the specification).

---

[106] Alan Said et al., *Analyzing Weighting Schemes in Collaborative Filtering: Cold Start, Post Cold Start and Power Users*, in PROCEEDINGS OF THE 27TH ANNUAL ACM SYMPOSIUM ON APPLIED COMPUTING (SAC'12) 2035, 2039 (2012).

147.    Means-plus-function claims such as those included in the '282 patent are inherently not abstract ideas.  Stanford Law Professor Mark Lemley described his analysis:

> If the patent is interpreted as a means-plus-function claim, it will be limited to the particular software implementation the patentee actually built or described.  Such a narrow, specific claim should not be an unpatentable "abstract idea."[107]

> But if you wrote it [an algorithm] and you included it in the step I think you could survive the *Aristocrat* line of cases and then the question will become well what does equivalent thereof mean?  Can I show you my algorithm and say, yeah, this is the approach I took but these other four approaches are equivalent and a computer programmer would look at those and say I don't care which one of those you use.  ***And if you can do that then you might end up with a claim that's still pretty broad even though it's in means plus function format***.[108]

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 5,885,282

148.    Fellowship Filtering references and incorporates by reference the preceding paragraphs of this Complaint.

149.    Alibaba makes, uses, sells, and/or offers for sale in the United States products and/or services for generating product and/or content recommendations.

150.    On information and belief, Alibaba recommendation products and/or services provide or support generating product and/or content recommendations based on enhanced collaborative filtering technologies to drive more successful and relevant recommendations.

151.    Alibaba makes, uses, sells, and/or offers for sale the Alibaba Website available at www.alibaba.com.

152.    Alibaba makes, uses, sells, and/or offers for sale the Taobao Website available at www.Taobao.com.

---

[107] Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 WISC. L. REV. 905 (2013).

[108] Eugene Quinn, *The Ramifications of Alice: A Conversation with Mark Lemley*, IPWATCHDOG BLOG, September 4, 2014, http://www.ipwatchdog.com/2014/09/04/the-ramifications-of-alice-a-conversation-with-mark-lemley/id=51023/ (emphasis added).

153.     Alibaba makes, uses, sells, and/or offers for sale the Aliexpress Website available at www.aliexpress.com.

154.     Alibaba makes, uses, sells, and/or offers for sale Aliyun cloud computing services and products at www.aliyun.com.

155.     On information and belief, Alibaba operates the internet site: http://www.alibaba.com.

156.     On information and belief, Alibaba operates the internet site: http://www.aliyun.com.

157.     On information and belief, Alibaba operates the internet site: http://www.aliexpress.com.

158.     On information and belief, Alibaba operates the internet site: http://www.taobao.com.

159.     On information and belief, Alibaba builds and offers to its customers recommendation products and services, such as, recommendation functionality on www.taobao.com, www.aliexpress.com, www.aliyun.com, www.alibaba.com, and all versions and variations thereof since the issuance of the '282 patent (collectively, "Alibaba Products").[109]

160.     On information and belief, Alibaba provides help documentation, guides and service manuals at: http://service.alibaba.com/buyer/contact_us.htm ("Alibaba Help Center").

161.     On information and belief, the Alibaba Help Center provides product guides and service manuals relating to Alibaba Products.

162.     On information and belief, the Alibaba Help Center provides documentation for Alibaba Products.

163.     On information and belief, one or more of the Alibaba Products incorporate collaborative filtering technology.

---

[109] For additional information the Alibaba Products: Alibaba Out Businesses, Alibaba Website (last visited December 2, 2015) available at: http://www.alibabagroup.com/en/about/businesses.

164.    On information and belief, one or more of the Alibaba Products enable the calculation of recommendations based on similarity, so people who bought this bought that or people who viewed this bought that, or people who viewed this viewed that are recommended relevant content or products.

165.    On information and belief, Alibaba Products are available to businesses and individuals throughout the United States.

166.    On information and belief, Alibaba Products are provided to businesses and individuals located in the Eastern District of Texas.

167.    On information and belief, Alibaba makes training sessions available (relating to one or more of the Alibaba Products) in the Eastern District of Texas.[110]

168.    On information and belief, one or more of the Alibaba Products calculate recommendations based on "explicit ratings" of content and/or products.



Quan Yuan, TAOBAO RECOMMENDATION: INVITED TALK ON RECOMMENDATION AND ADVERTISING IN ALIBABA, RecSys'13 (Quan Yuan is a Director of Recommendation Technologies at Taobao).

---

[110] ALIBABA TRAINING CHANNEL, ALIBABA WEBSITE (last visited December 2, 2015) available: http://seller.alibaba.com/training.htm.

169.    On information and belief, Alibaba has described its recommendation products as a "highly efficient distributed feature based collaborative filtering tool."[111]

170.    On information and belief, Alibaba has stated in its documentation that the occurrence of unnecessary recommendations could needlessly consume limited network resources by causing an increase in the volume of data transmitted in the network and reducing network data transmission speeds.

171.    On information and belief, the Alibaba Products enable the automatic discovery of individualized behavior patterns to generate highly accurate recommendations in real time.

172.    On information and belief, the Alibaba Products incorporate the determination of a similarity score based on values imputed by a user.

173.    On information and belief, one or more of the Alibaba Products enable the calculation of "similarity score," "attribute values," and/or "autocorrelation."

174.    On information and belief, one or more of the Alibaba Products enable the visualization of correlations between data.

175.    On information and belief, one or more of the Alibaba Products incorporate functionality for calculating Chi-square tests, measures of association, and risk differences.

176.    On information and belief, one or more of the Alibaba Products enable the analysis of distribution values from data sets.

177.    On information and belief, one or more of the Alibaba Products include functionality for calculating similarities between users including the use of Hierarchical Clustering, K-means Clustering and Profile search.

178.    On Information and belief, one or more of the Alibaba Products perform correlation matrix computation.

---

[111] Qiang Yan and Quan Yuan (Tao Search and P13N Team), LARGE SCALE RECOMMENDATION IN E-COMMERCE (October 10, 2014), *available at*: http://www.slideshare.net/scmyyan/large-scale-recommendation-in-ecommerce-qiang-yan.

179.    On information and belief, the recommendation engine in one or more of the Alibaba Products supports retail business processes by providing recommendations.

180.    On information and belief, the Alibaba Products enable the calculation of a "Cosine correlation."

181.    On information and belief, one or more of the Alibaba Products enable "Relevance Recommendation."

182.    On information and belief, one or more of the Alibaba Products enable "Complementary Recommendation."

183.    On information and belief, one or more of the Alibaba Products enable "Personalized real-time recommendation."

184.    On information and belief, one or more of the Alibaba Products provide recommendations based on "behavior data" including "ratings" data.

185.    On information and belief, one or more of the Alibaba Products enable providing recommendations by linking users with items in "a reasonable way."

186.    On information and belief, the following figure shows the architecture of a system implementing Alibaba Products recommendation functionality.



Yuan Quan (ETAO-ADS-RS Team), Large Scale E-Commerce Recommendation System at 8 (October 28, 2012).

187.    On information and belief, one or more of the Alibaba Products enable making recommendations based on "behavioral data" including "ratings."

188.    On information and belief, the "is similar to" function generates users that are similar to "users" in generating a recommendation.

189.    On information and belief, the below screenshot shows an example for running the "Algorithms of RS" function against ratings data stored in a system.



Yuan Quan (ETAO-ADS-RS Team), Large Scale E-Commerce Recommendation System at 10 (October 28, 2012).

190.    On information and belief, one or more of the Alibaba Products generate recommendations by controlling for "popularity bias."

191.    On information and belief, the Alibaba Products enable the calculation of a similarity value based on a test statistic for a first and second user.

192.    On information and belief, one or more of the Alibaba Products enable multivariate calculations to determine a recommendation.

193.    On information and belief, one or more of the Alibaba Products generate similarity calculations by taking into account the total number of items the users have in common.

194.    On information and belief, one or more of the Alibaba Products are predictive analytics tools that enable K-means clustering analysis.  K-means clustering identifies groups of similar data values in large segments of stored data.

195.    On information and belief, the Alibaba Products can generate real time predictions and recommendations using a collaborative filtering engine that analyzes user interactions and ratings.

196.    On information and belief, one or more of the Alibaba Products take into account the ratings distribution in recommending products and/or content.

197.    On information and belief, one or more of the Alibaba Products use user-based matching to determine matches between a first and second user.  When a first user inputs ratings data that ratings data is compared against the ratings data of other users.

198.    On information and belief, one or more of the Alibaba Products compare user ratings for a common item to recommend a new item to a user.

199.    On information and belief, Alibaba states in its documentation for one or more of the Alibaba Products that the recommendation engine generates average ratings.

200.    On information and belief, one or more of the Alibaba Products enable creation of a correlation matrix.



*Invited talk on Recommendation and Advertising in Alibab*a, RecSys'13 (2013), *available at:* http://www.slideshare.net/quanyuan008/rec-sys-yqalibaba (author is Quan Yuan, Tech. Director, Taobao Recommendation).

201.    On information and belief, one or more of the Alibaba Products enable recommendation strategies including comparing users' purchasing history against prior users of a website.

202.    On information and belief, one or more of the Alibaba Products includes algorithms that use averaging to improve predictive accuracy.



Qiang Yan and Quan Yuan (Tao Search and P13N Team), LARGE SCALE RECOMMENDATION IN E-COMMERCE (October 10, 2014), *available at*: http://www.slideshare.net/scmyyan/large-scale-recommendation-in-ecommerce-qiang-yan.

203.    On information and belief, one or more of the Alibaba Products enable the use of "k-means" to generate recommendations of products and/or content.

204.    On information and belief, one or more of the Alibaba Products enable the identification of recommended products and/or content based on linking products to users' browsing and/or purchase history.

205.    On information and belief, one or more of the Alibaba Products incorporate K-Nearest Neighbor and/or Naïve Bayes algorithms.

206.    On information and belief, one or more of the Alibaba Products generate recommendation data using an "average user," whose ratings are the average of all users' ratings.

207.    On information and belief, one or more of the Alibaba Products incorporate an "average user" value to improve the confidence level of recommendations.

208.    On information and belief, one or more of the Alibaba Products have an interface for receiving ratings data as shown in the below screen capture:



ALIEXPRESS.COM WEBSITE, (last visited December 2 2015), available at: http://www.aliexpress.com/store/product/Tronsmart-Ara-X5-Windows-10-Smart-TV-Box-Intel-Cherry-Trail-Z8300-Quad-Cores-1-8GHz/323423_32454284308.html.

209.    On information and belief, the Alibaba Products enable the collection of ratings data using an "information-gathering module."

210.    On information and belief, the Alibaba Products generate a numerical value as part of creating a recommendation of a product and/or content.

211.    On information and belief, one or more of the Alibaba Products enable "similarity" scoring.

212.    On information and belief, one or more of the Alibaba Products generate recommendations based on analyzing the entire population of users.

213.    On information and belief, the Alibaba Products use algorithmic approaches to generate recommendations and preference data.

214.    On information and belief, the Alibaba Products transform data associated with a user to provide product and/or content recommendations.

215.    On information and belief, Alibaba has directly infringed and continues to directly infringe the '282 patent by, among other things, making, using, offering for sale, and/or selling collaborative filtering products and services, including but not limited to, the Alibaba Products, which include infringing content and/or product recommendation technologies.  Such products and/or services include, by way of example and without limitation, www.taobao.com, www.aliexpress.com, www.aliyun.com, and www.alibaba.com, which are covered by one or more claims of the '282 patent, including but not limited to claims 19 and 25.

216.    By making, using, testing, offering for sale, and/or selling collaborative filtering products and services, including but not limited to the Alibaba Products, Alibaba has injured Fellowship Filtering and is liable to Fellowship Filtering for directly infringing one or more claims of the '282 patent, including at least claims 19 and 25, pursuant to 35 U.S.C. § 271(a).

217.    On information and belief, Alibaba also infringes indirectly the '282 patent by active inducement under 35 U.S.C. § 271(b).

218.    On information and belief, Alibaba had knowledge of the '282 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Alibaba knew of the '282 patent and knew of its infringement, including by way of this lawsuit.

219.    On information and belief, Alibaba intended to induce patent infringement by third-party customers and users of the Alibaba Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Alibaba specifically intended and was aware that the normal and customary use of the accused products would infringe the '282 patent.  Alibaba performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '282 patent and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement.  For example, Alibaba provides the Alibaba Products that have the capability of operating in a manner that infringe one or more of the claims of the '282 patent,

including at least claims 19 and 25, and Alibaba further provides documentation and training materials that cause customers and end users of the Alibaba Products to utilize the products in a manner that directly infringe one or more claims of the '282 patent.  By providing instruction and training to customers and end-users on how to use the Alibaba Products in a manner that directly infringes one or more claims of the '282 patent, including at least claims 19 and 25, Alibaba specifically intended to induce infringement of the '282 patent.  On information and belief, Alibaba engaged in such inducement to promote the sales of the Alibaba Products, *e.g.,* through Alibaba's user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '282 patent.  Accordingly, Alibaba has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '282 patent, knowing that such use constitutes infringement of the '282 patent.

220.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '282 patent.

221.    As a result of Alibaba's infringement of the '282 patent, Fellowship Filtering has suffered monetary damages in an amount adequate to compensate for Alibaba's infringement, but in no event less than a reasonable royalty for the use made of the invention by Alibaba together with interest and costs as fixed by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Fellowship Filtering respectfully requests that this Court enter:

A.      A judgment in favor of Plaintiff Fellowship Filtering that Alibaba has infringed, either literally and/or under the doctrine of equivalents, the '282 patent;

B.      An award of damages resulting from Alibaba's acts of infringement in accordance with 35 U.S.C. § 284;

C.      A judgment and order requiring Alibaba to provide accountings and to pay supplemental damages to Fellowship Filtering, including, without limitation, prejudgment and post-judgment interest; and

D.      Any and all other relief to which Fellowship Filtering may show itself to be entitled.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Fellowship Filtering requests a trial by jury of any issues so triable by right.

Dated:  December 3, 2015                    Respectfully submitted,


                                            /s/  Elizabeth L. DeRieux_____
                                            Elizabeth L. DeRieux (TX Bar No. 05770585)
                                            D. Jeffrey Rambin (TX Bar No. 00791478)
                                            CAPSHAW DERIEUX, LLP
                                            114 E. Commerce Ave.
                                            Gladewater, Texas 75647
                                            Telephone: 903-845-5770
                                            E-mail: ederieux@capshawlaw.com
                                            E-mail: jrambin@capshawlaw.com


                                            OF COUNSEL:

                                                Matt Olavi (CA SB No. 265945)
                                                OLAVI DUNNE LLP
                                                816 Congress Ave., Ste. 1620
                                                Austin, Texas 78701
                                                Telephone: 512-717-4485
                                                Facsimile: 512-717-4495
                                                E-mail: molavi@olavidunne.com

                                                Dorian S. Berger (CA SB No. 264424)
                                                Daniel P. Hipskind (CA SB No. 266763)
                                                OLAVI DUNNE LLP
                                                1880 Century Park East, Ste. 815
                                                Los Angeles, CA 90067
                                                Telephone: 213-516-7900
                                                Facsimile: 213-516-7910
                                                E-mail: dberger@olavidunne.com
                                                E-mail: dhipskind@olavidunne.com


                                                *Attorneys for Fellowship Filtering
                                                Technologies LLC*